**UNITED STATES DISTRICT COURT**

**NORTHERN DISTRICT OF CALIFORNIA**

| | |
|---|---|
| IN RE: SOCIAL MEDIA ADOLESCENT ADDICTION/PERSONAL INJURY PRODUCTS LIABILITY LITIGATION | Case No. 4:22-md-03047-YGR<br><br>MDL No. 3047 |
| This Document Relates to:<br>MARIN COUNTY, CALIFORNIA, Plaintiff, vs. META PLATFORMS, INC., et al., Defendants<br><br>Member Case No.:<br>4:26-cv-08899 | **LOCAL GOVERNMENT AND SCHOOL DISTRICT MASTER SHORT-FORM COMPLAINT AND DEMAND FOR JURY TRIAL** |

The Plaintiff(s) named below file(s) this *Short-Form Complaint and Demand for Jury Trial* against the Defendant(s) named below by and through their undersigned counsel. Plaintiff(s) incorporate(s) by reference the allegations, claims, and relief sought in *Plaintiffs' Master Local Government and School District Complaint* ("Master Complaint") as it relates to the named Defendant(s) (checked-off below), filed in *In Re: Social Media Adolescent Addiction/Personal Injury Products Liability Litigation*, MDL No. 3047, in the United States District Court for the Northern District of California. Plaintiff(s) file(s) this *Short-Form Complaint* as permitted by Case Management Order No 8.

Plaintiff(s) indicate(s) by checking the relevant boxes below the Parties and Causes of Actions specific to Plaintiff(s)' case.

Plaintiff(s), by and through their undersigned counsel, allege(s) as follows:

## I. DESIGNATED FORUM

1. *For Direct Filed Cases:* Identify the Federal District Court in which the Plaintiff(s) would have filed in the absence of direct filing:

United States District Court of the Northern District of California.

2. *For Transferred Cases:* Identify the Federal District Court in which the Plaintiff(s) originally filed and the date of filing:

## II. IDENTIFICATION OF PARTIES

### A. PLAINTIFF(S)

3. *Plaintiff(s):* Name(s) of the local government or school district alleging claims against Defendant(s):

Marin County, California

4. Number of schools served in the Plaintiff(s)' school district or local community:

There are approximately 109 schools in Marin County.

5. Number of minors served in the Plaintiff(s)' school district or local community:

There are approximately 46,000 children under 18 years old in Marin County.

6. At the time of the filing of this *Short-Form Complaint*, Plaintiff(s) is/are a resident and citizen of [*Indicate State*]:

The State of California.

**B. DEFENDANT(S)**

7. Plaintiff(s) name(s) the following Defendant(s) in this action [*Check all that apply*]:

**META ENTITIES**

- ☑ META PLATFORMS, INC., *formerly known as* Facebook, Inc.
- ☑ INSTAGRAM, LLC
- ☑ FACEBOOK PAYMENTS, INC.
- ☑ SICULUS, INC.
- ☐ FACEBOOK OPERATIONS, LLC
- ☑ FACEBOOK HOLDINGS, LLC
- ☑ META PAYMENTS INC.

**TIKTOK ENTITIES**

- ☑ BYTEDANCE LTD
- ☑ BYTEDANCE INC.
- ☑ TIKTOK LTD
- ☑ TIKTOK LLC
- ☑ TIKTOK INC.

**SNAP ENTITY**

- ☑ SNAP, INC.

**GOOGLE ENTITIES**

- ☑ GOOGLE, LLC
- ☑ YOUTUBE, LLC

**OTHER DEFENDANTS**

For each "Other Defendant" Plaintiff(s) contends are additional parties and are liable or responsible for Plaintiff(s)' damages alleged herein, Plaintiff(s) must identify by name each Defendant and its citizenship, and Plaintiff(s) must plead the specific facts supporting any claim against each "Other Defendant" in a manner complying with the requirements of the Federal Rules of Civil Procedure. In doing so, Plaintiff(s) may attach additional pages to this *Short-Form Complaint*.

| NAME | CITIZENSHIP |
|---|---|
| Meta Platforms Technologies, LLC | Delaware, California |
| | |
| | |
| | |
| | |

## III. CAUSES OF ACTION ASSERTED

8. The following Causes of Action asserted in the *Master Complaint*, and the allegations with regard thereto, are adopted in this *Short-Form Complaint* by reference (*check all that are adopted*):

| Asserted Against[1] | Count Number | Cause of Action (COA) |
|---|---|---|
| ☑ Meta entities<br>☑ Snap<br>☑ TikTok entities<br>☑ Google entities<br>☑ Other Defendant(s)[2] | 1 | NEGLIGENCE |
| ☑ Meta entities<br>☑ Snap<br>☑ TikTok entities<br>☑ Google entities<br>☑ Other Defendant(s) | 2 | PUBLIC NUISANCE |

**NOTE**

If Plaintiff(s) want(s) to allege additional Cause(s) of Action other than those selected in paragraph 8, which are the Causes(s) of Action set forth in the *Master Complaint*, the facts supporting those additional Cause(s) of Action, must be pled in a manner complying with the requirements of the Federal Rules of Civil Procedure. In doing so, Plaintiff(s) may attach additional pages to this *Short-Form Complaint*.

## IV. ADDITIONAL CAUSES OF ACTION

9. Plaintiff(s) assert(s) the following additional Causes of Action and supporting allegations against the following Defendants:

(3) Fraudulent Misrepresentation and Concealment (Against All Defendants); (4) Gross Negligence (Against All Defendants); (5) Violation of the Racketeer Influenced and Corrupt Organizations Act, 18 U.S.C. §1961, et seq. (Against All Defendants)

See Attachment A: SUPPORTING ALLEGATIONS REGARDING SHORT-FORM COMPLAINT AND DEMAND FOR JURY TRIAL.

[1] For purposes of this paragraph, "entity" means those Defendants identified in Paragraph 7 (*e.g.*, "TikTok entities" means all TikTok Defendants against which Plaintiff(s) is/are asserting claims).

[2] Reference selected "Other Defendants" by the corresponding row number in the "Other Defendant(s)" chart identified in Paragraph 7.

**WHEREFORE**, Plaintiff(s) pray(s) for relief and judgment against Defendants and all such further relief that this Court deems equitable and just as set forth in the *Master Complaint*, and any additional relief to which Plaintiff(s) may be entitled.

**JURY DEMAND**

Plaintiff(s) hereby demand a trial by jury as to all claims in this action.

****

By signature below, Plaintiff(s)' counsel hereby confirms their submission to the authority and jurisdiction of the United States District Court of the Northern District of California and oversight of counsel's duties under Federal Rule of Civil Procedure 11, including enforcement as necessary through sanctions and/or revocation of *pro hac vice* status.

/s/ Aelish M. Baig

Name: AELISH M. BAIG

Firm: ROBBINS GELLER RUDMAN & DOWD LLP

Address: One Montgomery St., Suite 1800, San Francisco, CA 94104

Phone: 415/288-4545

Fax: 415/288-4534

Email: aelishb@rgrdlaw.com

*Attorneys for Plaintiff(s)*

OFFICE OF MARIN COUNTY COUNSEL
BRANDON W. HALTER (289687)
Marin County Counsel
KATE STANFORD (302825)
Deputy County Counsel
County of Marin
3501 Civic Center Drive, Suite 275
San Rafael, CA 94903
Telephone: 415/473-6117

# ATTACHMENT A

ROBBINS GELLER RUDMAN
& DOWD LLP
AELISH M. BAIG (201279)
TAEVA C. SHEFLER (291637)
One Montgomery Street, Suite 1800
San Francisco, CA 94104
Telephone: 415/288-4545
415/288-4534 (fax)
aelishb@rgrdlaw.com
tshefler@rgrdlaw.com

OFFICE OF MARIN COUNTY COUNSEL
BRANDON W. HALTER (289687)
Marin County Counsel
KATE STANFORD (302825)
Deputy County Counsel
County of Marin
3501 Civic Center Drive, Suite 275
San Rafael, CA 94903
Telephone: 415/473-6117
brandon.halter@marincounty.gov
kate.stanford@marincounty.gov

Attorneys for Plaintiff

[Additional counsel appear on signature page.]

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA
OAKLAND DIVISION

| | |
|---|---|
| In re SOCIAL MEDIA ADOLESCENT ADDICTION/PERSONAL INJURY PRODUCTS LIABILITY LITIGATION | MDL Case No. 4:22-md-03047-YGR |
| This Document Relates To:<br><br>MARIN COUNTY,<br><br>Plaintiff,<br><br>vs.<br><br>META PLATFORMS, INC., et al.,<br><br>Defendants. | Case No. 4:26-cv-08899 |

SUPPORTING ALLEGATIONS REGARDING SHORT FORM COMPLAINT AND DEMAND FOR JURY TRIAL

# TABLE OF CONTENTS

Page


I. ADDITIONAL ALLEGATIONS ........ 1

A. The Parties ........ 2

1. Plaintiff ........ 2

2. Additional Defendants ........ 3

B. Defendants Employ Artificial Intelligence in Ways that Expose Youth to Harmful Experiences ........ 3

C. Defendants Have Worked Together as Part of an Enterprise Through a Pattern of Racketeering Activity to Maximize Youth Users and Engagement While Misrepresenting the Safety of Their Platforms for Profit ........ 7

1. Defendants Partner with Each Other to Target Youth While Failing to Warn and Protect Youth on Their Platforms ........ 9

2. Defendants Disseminate False and Misleading Messages About the Safety of Social Media for Youth Users ........ 11

a. Meta ........ 12

b. TikTok ........ 17

c. YouTube ........ 20

d. Snapchat ........ 21

3. Defendants Use Industry Groups to Disseminate Their False and Misleading Messaging to Parents and the American Public ........ 22

a. NetChoice ........ 23

b. Computer and Communications Industry Association ........ 25

c. Information Technology Industry Council ........ 27

d. TechNet ........ 28

e. Chamber of Progress ........ 29

D. Social Media Has Harmed Marin County Youth ........ 29

E. Social Media Has Had a Harmful Effect on Marin County ........ 34

II. ADDITIONAL CAUSES OF ACTION ........ 38

COUNT III ........ 38

**Page**

Fraudulent Misrepresentation and Concealment (Against All Defendants) ..........38

COUNT IV ..........39

Gross Negligence (Against All Defendants) ..........39

COUNT V ..........41

Violation of the Racketeer Influenced and Corrupt Organizations Act, 18 U.S.C. §1961, *et seq.* (Against All Defendants) ..........41

PRAYER FOR RELIEF ..........50

# I. ADDITIONAL ALLEGATIONS

1. Marin County, California has borne painful witness to the devastating impact of social media on its youth.

2. Like virtually everywhere in the United States, Marin County's youth suffer from a high degree of distraction, depression, suicidality, and other mental disorders caused by or worsened by the overconsumption of social media on a daily basis, which substantially interferes with the rights of health and safety common to the general public. According to a recent survey, nearly 90% of local teens report anxiety among their peers, more than 86% report high stress or burnout, and over 70% report depression or low self-esteem.[1] Disturbingly, more than half of respondents reported self-harm behavior in their social circles, and nearly 45% noted suicidal thoughts among peers. The respondents further reported that using social media was a significant factor in negatively impacting their mental health. Another survey found that fifteen percent of Marin County 11th grade students reported having considered suicide.[2]

3. Social media addiction directly amplifies youth exposure to online harms, a crisis heavily compounded by Defendants' affirmative misrepresentations of platform safety, systemic failure to warn of known dangers, and failure to report Child Sexual Abuse Material ("CSAM")—all while providing ineffective parental controls and broken reporting structures. In 2024, a Marin County teenager died by suicide after reportedly becoming addicted to social media and learning methods of self-harm and suicide on social media platforms.[3] In another recent case, a 13-year-

---

[1] AIM Youth Mental Health, *AIM Ideas Lab Youth Survey 2024 Marin County* (2024), at 2, https://aimymh.org/wp-content/uploads/2024/07/Marin-County-AIM-Ideas-Lab-Report-2024.pdf.

[2] CalSCHLS, *California Healthy Kids Survey, Marin County Secondary 2023-2025 Main Report* (June 23, 2026), https://data.calschls.org/resources/Marin_County_2325_Sec_CHKS.pdf.

[3] Keri Brenner, *Bay Area parents who lost daughter praise social media verdict*, East Bay Times (Mar. 26, 2026), https://www.eastbaytimes.com/2026/03/26/marin-parents-who-lost-daughter-praise-social-media-verdict/.

old child from Marin was threatened with the release of private images in exchange for sex.[4] In yet another, a social media user harassed and bullied Marin County youth by distributing embarrassing and illicit photos of teens leaked from their social media profiles.[5]

4. Compulsive social media addiction directly strains Marin County's local infrastructure, overwhelming behavioral health, medical, emergency dispatch, and legal systems with severe operational repercussions. Driven by an unprecedented surge in youth anxiety, depression, and self-harm, the county is increasingly forced to absorb the fallout of platform-driven threats. To protect vulnerable youth, local agencies have progressively adapted public health and legal strategies while diverting limited law enforcement funds—yet far more is needed to fully combat the scale of this systemic crisis.

**A. The Parties**

**1. Plaintiff**

5. Plaintiff the County of Marin ("Marin County") is a political subdivision of the State of California, organized and existing under the laws of the State of California, specifically Government Code §23000, *et seq.* The Board of Supervisors for Marin County is located at 3501 Civic Center Drive, Suite 329, San Rafael, California 94903. Marin County has the power to enter into contracts, sue, and be sued. Cal. Gov. Code §23004. Marin County has an overall population of around 256,400 people, with approximately 41,545 residents in Marin County aged 5-19 years old.[6]

6. Marin County brings this action on its own behalf.

---

[4] Aidin Vaziri, *Novato teen arrested in sextortion case involving 13-year-old*, S.F. Chronicle (July 9, 2025), https://www.sfchronicle.com/bayarea/article/novato-teen-arrested-sextortion-20763156.php.

[5] Phil Mayer, *Social media account offered 'embarrassing and illicit' images of Marin County teens*, one arrested, KRON4 (June 11, 2024), https://www.kron4.com/news/bay-area/social-media-account-offered-embarrassing-and-illicit-images-of-marin-county-teens-one-arrested/.

[6] U.S. Census Bureau, U.S. Department of Commerce, "Age and Sex," *American Community Survey, Marin County, California ACS, 1-Year Estimates Subject Tables, Table S0101*, 2024, https://data.census.gov/table/ACSST1Y2024.S0101?g=050XX00US06041 (last visited June 23, 2026).

### 2. Additional Defendants

7. Defendant Meta Platforms, Inc.'s ("Meta" or "Company") subsidiary, defendant Meta Platforms Technologies, LLC ("Meta Platforms Technologies"), was organized under the laws of the State of Delaware as "Oculus VR, LLC" on March 21, 2014, and acquired by Meta on March 25, 2014. Meta Platforms Technologies develops Meta's virtual and augmented reality technology, such as the Meta Quest line of services, among other technologies, related to Meta's platforms, and its principal place of business is in Menlo Park, California. Defendant Meta is the sole member of Meta Platforms Technologies.

## B. Defendants Employ Artificial Intelligence in Ways that Expose Youth to Harmful Experiences

8. Defendants utilize AI and machine learning through the development and operation of features, including the release of original content, that are inherently dangerous and harmful to youth. These features serve to facilitate problematic, compulsive, and/or addictive uses by youth users, as well as expose youth to harmful experiences due to the lack of meaningful protections for youth users.

9. Defendants' use of AI and machine learning falls into at least three categories: (a) the use of AI to promote addictive use; (b) AI machine learning to conduct content moderation; and (c) the development and publication of AI-generated original content, including, but not limited to, through large language models such as chatbots.

10. First, Defendants intentionally design and operate their platforms to maximize users' screen time through the use of features intended to exploit human psychology using complex algorithms driven by advanced AI and machine-learning systems. For example, Meta uses AI to keep users engaged. Rather than display information chronologically, posts are displayed based on a user's previous online activity, including whether the user previously "share[d]," "like[d]," or otherwise engaged with similar content.[7] In March 2024, Meta unveiled that it would begin

---

[7] Email from Nick Clegg to Mark Zuckerberg, Re: Well-being product strategy and tech headcount (Aug. 28, 2021), https://www.blumenthal.senate.gov/imo/media/doc/13124metadocuments.pdf.

using a new artificial model across all its social media platforms that promised to be even more effective at prolonging the time that users spent online.[8] Tom Alison, Head of Facebook, said that the new model kept users watching its video "Reels" for 8%-10% longer, proving that the model was "learning from the data much more efficiently than the previous generation." Matt Motyl, a senior Meta researcher, said that the Reels platform was launched without sufficient safeguards, and that Meta was aware of problems caused by its algorithm.[9] Defendants have failed to implement effective parental controls to prevent such activity from causing harm to youth. Defendants have also failed to implement effective tools for youth/parent users to choose to avoid such problematic and harmful experiences.

11. Second, YouTube has also developed and operates machine learning technology with the goal of increasing the amount of time users spend watching content on YouTube. The AI-driven suggestions succeed in maximizing user engagement. YouTube's Chief Product Officer Neal Mohan stated in 2018 that YouTube's AI-driven recommendations are responsible for 70% of the time users spend on YouTube.[10] In other words, 70% of all YouTube content that users watch was recommended to users by YouTube's machine learning technology, as opposed to users purposely searching for and identifying the content they watch. Defendants have failed to implement effective parental controls to prevent such activity from causing harm to youth. Defendants have failed to implement effective tools for youth/parent users to choose to avoid such problematic and harmful experiences.

12. Defendants rely on AI-driven technology to moderate content on their platforms, which fail to detect and block inappropriate and harmful content accessed by youth. This leads to

---

[8] Jonathan Vanian, *Meta is building a giant AI model to power its 'entire video ecosystem,' exec says*, CNBC (Mar. 6, 2024), https://www.cnbc.com/2024/03/06/facebook-working-on-single-ai-model-to-power-all-video-recommendations.html.

[9] Marianna Spring, Mike Radford, *Meta and TikTok let harmful content rise after evidence outrage drove engagement, say whistleblowers*, BBC (Mar. 15, 2026), https://www.bbc.com/news/articles/cqj9kgxqjwjo.

[10] Joan E. Solsman, *YouTube's AI is the puppet master over most of what you watch*, CNET (Jan. 10, 2018), https://www.cnet.com/tech/services-and-software/youtube-ces-2018-neal-mohan/.

youth harms, including, but not limited to, youth users being exposed to CSAM; being targeted by adult predators; and finding content that promotes self-harm and suicidality and is otherwise harmful. Defendants have failed to adequately warn parents, schools, and the public and have failed to implement effective parental controls and reporting systems to prevent such activity from causing harm to youth. Defendants have failed to implement effective tools for youth/parent users to choose to avoid such problematic and harmful experiences.

13. Third, Defendants have developed and are operating chatbots that engage with users, including youth users, with original content composed by the applications themselves. For instance, Meta recently unveiled an AI chatbot with 28 personas, among them the "ride-or-die older sister" resembling Kendall Jenner, aimed at engaging younger users.[11] A recent investigation by Reuters revealed internal Meta documents detailing company standards on chatbot behavior that permitted the company's AI chatbots to "engage a child in conversations that are romantic or sensual."[12] Specifically, the standards indicated "[i]t is acceptable to describe a child in terms that evidence their attractiveness (ex: 'your youthful form is a work of art')." The documents also noted that it would be acceptable for a bot to tell a shirtless eight-year-old that "every inch of you is a masterpiece – a treasure I cherish deeply."[13] The rules for the AI chatbots were approved by Meta's legal, public policy, and engineering staff, including its chief ethicist, according to the document.[14]

14. In 2023, Snapchat added to its feed "My AI," an AI chatbot that engages with users, including children, with on-demand text produced by the application itself. Snapchat developed this "virtual friend" to further increase engagement. It has features that make its chatbot more

---

[11] Scott Raines, *Meta AI: How do the AI characters interact with people?*, Deseret News (Nov. 26, 2023), https://www.deseret.com/2023/11/25/23970137/meta-ai-billie-big-sister-artificial-intelligence-tom-brady-kendall-jenner/.

[12] Jeff Horwitz, *Meta's AI rules have let bots hold 'sensual' chats with kids, offer false medical info*, Reuters (Aug. 14, 2025), https://www.reuters.com/investigates/special-report/meta-ai-chatbot-guidelines/.

[13] *Id.*

[14] *Id.*

"friendly," such as the option to customize the chatbot's name, design a custom bitmoji avatar for it, and include it in group chats with friends.[15] It is not possible to remove the chatbot from a user's feed unless that user subscribes to Snap, Inc.'s ("Snap") premium subscription service for a fee.

15. In tests that have been recreated multiple times, Snap's My AI responds to self-identified youth users with inappropriate and misleading content, including how to hide the smells of alcohol and marijuana, how to "set the mood" for a minor having sex with a 30-year-old for the first time, and allows essay writing for self-identified students when asked to do so for a school project.[16] It even explains to teens how to hide the Snapchat application from parental monitoring.[17] In user tests, the My AI becomes more problematic the longer one chats with it.[18]

16. Snap's My AI is also problematic in providing mental health advice to youth users because it can reinforce confirmation bias, allowing users to continue to feel badly if they approach the chatbot in a negative mood.[19] According to Alexandra Hamlet, a clinical psychologist in New York City: "If a teen is in a negative mood and does not have the awareness desire to feel better, they may seek out a conversation with a chatbot that they know will make them feel worse. . . .

---

[15] Samantha Murphy Kelly, *Snapchat's new AI chatbot is already raising alarms among teens and parents*, CNN Bus. (Apr. 27, 2023), https://www.cnn.com/2023/04/27/tech/snapchat-my-ai-concerns-wellness/index.html.

[16] Geoffrey A. Fowler, *Snapchat tried to make a safe AI. It chats with me about booze and sex*, Wash. Post (Mar. 14, 2023), https://www.washingtonpost.com/technology/2023/03/14/snapchat-myai/; *see also* Common Sense Media, AI Initiative, *My AI* (Aug. 12, 2024), https://www.commonsensemedia.org/ai-ratings/my-ai.

[17] *Id.*

[18] *Id.*

[19] Sarah Perez, *Several popular AI products flagged as unsafe for kids by Common Sense Media*, TechCrunch (Nov. 16, 2023), https://techcrunch.com/2023/11/16/several-popular-ai-products-flagged-as-unsafe-for-kids-by-common-sense-media/#:~:text=An%20independent%20review%20of%20popular%20AI%20tools%20has,Stable%20Diffusion%2C%20may%20not%20be%20safe%20for%20kids.

Over time, having interactions like these can erode . . . teens' sense of worth, despite their knowing that they are really talking to a bot."[20]

17. Defendants' large language models and chatbots put youth users at an unreasonable risk of harm and expose youth users to harmful experiences and inappropriate and dangerous content created by Defendants themselves. Defendants are aware that their AI language models are "experimental" and yet continue to expose youth to harm through the original content they produce.[21] For instance, Meta allows its AI chatbots to participate in sexual roleplay with youth and "to create statements that demean people on the basis of their protected characteristics."[22] An August 19, 2025 letter from ten U.S. Senators to Mark Zuckerberg at Meta identified the risk of data collection for youth under 13 years old through interactions with chatbots.[23] Defendants have failed to implement effective parental controls and reporting systems to prevent such activity from causing harm to youth. Defendants have failed to implement effective tools for youth/parent users to choose to avoid such problematic and harmful experiences.

### C. Defendants Have Worked Together as Part of an Enterprise Through a Pattern of Racketeering Activity to Maximize Youth Users and Engagement While Misrepresenting the Safety of Their Platforms for Profit

18. Defendants colluded with Industry Groups[24] (together forming an "Enterprise") with the collective goal to maximize youth users and youth engagement on social media through: (a) direct partnerships; (b) collective misrepresentations and omissions relating to youth safety;

---

[20] Samantha Murphy Kelly, *Snapchat's new AI chatbot is already raising alarms among teens and parents*, *supra* n.15.

[21] Geoffrey A. Fowler, *Snapchat tried to make a safe AI. It chats with me about booze and sex*, *supra* n.16.

[22] Jeff Horwitz, *Meta's AI rules have let bots hold 'sensual' chats with kids, offer false medical info, supra* n.12.

[23] Letter from Sen. Brian Schatz et al., to Mark Zuckerberg (Aug. 19, 2025), https://www.schatz.senate.gov/imo/media/doc/meta_letter_8-19-2025.pdf.

[24] Industry Groups include Net Choice, Computer and Communications Industry Association ("CCIA"), Information Technology Industry Council ("ITI"), TechNet, and Chamber of Progress.

and (c) the collective development and funding of Front Groups (including, but not limited to, NetChoice, Computer and Communications Industry Association ("CCIA"), Information Technology Industry Council ("ITI"), TechNet, and Chamber of Progress) through which they affirmatively mislead parents, schools, and the American public regarding the dangers associated with youth social media use (collectively, the "Scheme").

19. Defendants' Scheme was created to drive revenue and profit. Irrespective of the nature of their relationship as competitors, each Defendant stood to gain by working together to create and normalize the false narrative that social media (in its current form) is safe and beneficial for youth.

20. Indeed, in a memorandum circulated in advance of an August 2019 meeting of tech giants, including Facebook and Google, it was noted that the industry needed a "***coordinated approach***" on stalling legislation that would provide online protections for children. Specifically, Google executives claimed in the memo to "'have been successful in slowing down and delaying the [regulation] process and [to] have been ***working behind the scenes hand in hand with the other companies***'" to "'***find areas of alignment*** and narrow gaps in our positions and priorities ***on child privacy and safety***.'"[25] The memorandum continued: "'Whether at this meeting or at another forum, ***we may want to reinforce that this is an area of particular importance to have a coordinated approach***.'"[26] Such "coordinated approach" is now the subject of a lawsuit brought by Texas and eight other states alleging that Google/YouTube worked with Facebook to illegally manipulate the online advertising market (a market largely comprised of children and teens).[27]

---

[25] Leah Nylen, *Google sought fellow tech giants' help in stalling kids' privacy protections, states allege*, Politico (Oct. 22, 2021), https://www.politico.com/news/2021/10/22/google-kids-privacy-protections-tech-giants-516834.

[26] *Id.*; *see also* Leah Nylen, *Google, Facebook made secret deal to divvy up market, Texas alleges*, Politico (Dec. 16, 2020), https://www.politico.com/news/2020/12/16/google-facebook-suppress-competition-ads-447315 (reporting on lawsuit filed by Texas and eight other states alleging Google teamed up with Facebook in secret unlawful pact to divide up the advertising market).

[27] Press Release, FTC, *Google and YouTube Will Pay Record $170 Million for Alleged Violations of Children's Privacy Law* (Sep. 4, 2019), https://www.ftc.gov/news-events/news/press-releases/2019/09/google-youtube-will-pay-record-170-million-alleged-violations-childrens-privacy-law

### 1. Defendants Partner with Each Other to Target Youth While Failing to Warn and Protect Youth on Their Platforms

21. Defendants' association-in-fact is comprised of various ongoing partnerships, including with each other and with their Industry Groups, for the common purpose of carrying out the Scheme.

22. Defendants have ***directly partnered***, and continue to directly partner, with each other to drive youth users and engagement on their platforms, while failing to adequately warn of harm to youth and implement effective safety measures:

(a) Meta partnered with Google/YouTube to target teenagers on YouTube with advertisements for Instagram in order to grow both companies' youth user base.[28] To circumvent prohibitions on personalized ads for users under 18, Meta hired an intermediary, Spark Foundry, to help it reach teens on YouTube with Instagram ads. YouTube staff advised Spark on how to use unpublicized, unattributed targeting groups so as to direct ads at teens without triggering official policy flags. As a result, EU regulators launched several actions including formal Digital Services Act ("DSA") proceedings in May 2024, including requests for information, seeking to explicitly ban targeted advertising to minors.

(b) Meta (through its subsidiaries, including Meta Technologies, Inc.) also partners with Google/YouTube to increase youth engagement through Meta's virtual reality ("VR") Quest platform and headsets. YouTube and Meta have developed a cross-platform collaboration enabling users to livestream directly from Quest to YouTube.[29] There are also cross-

("'YouTube touted its popularity with children to prospective corporate clients,' said FTC Chairman Joe Simons.").

[28] Nisha Gopalan, *EU Probes Alleged Google-Meta Ad Deal Aimed at Teens*, Investopedia (Dec. 10, 2024), https://www.investopedia.com/eu-probes-alleged-google-meta-ad-deal-aimed-at-teens-8758736; *Google and Meta accused of secret deal to target under-18s*, WARC (Aug. 8, 2024), https://www.warc.com/content/feed/google-and-meta-accused-of-secret-deal-to-target-under-18s/en-GB/9772; Stephen Morris and Javier Espinoza, *Brussels probes Google and Meta secret ads deal to target teens*, Fin. Times (Dec. 10, 2024), https://www.ft.com/content/fac060e0-4778-4ea6-a040-12bb7bf75806.

[29] Meta, *Livestream from Meta Quest to YouTube using OBS*, https://www.meta.com/help/quest/795940759267558/ (last visited Jan. 8, 2026).

platform creator tools and advertising options. Separately, YouTube has a VR application available for use on the Meta Quest platform.[30] The application allows users to experience YouTube videos in VR, and offers the additional ability to "host a watch party" for multiple users to watch YouTube content together in Meta VR.[31] According to Meta, young users are a "key focus" and represent a growing share of Meta's VR user base. Studies show that up to 33% of U.S. teens are on Meta's VR platform.[32] According to a complaint filed with the Federal Trade Commission ("FTC") in April 2025, Meta also knowingly allows children under 13 years old onto its VR platform using standard adult accounts (and collects their data without consent in violation of the Children's Online Privacy Protection Act ("COPPA"));[33] the request for investigation was supported by Senator Edward Markey and Congresswoman Kathy Castor, the authors of COPPA 2.0.[34] On September 9, 2025, Savage and Jason Sattizahn ("Sattizahn"), both former Meta user experience researchers for Meta's VR platforms, testified before the U.S. Senate Committee on the Judiciary Subcommittee on Privacy, Technology and the Law.[35] Savage explained that Meta

---

[30] YouTube, *YouTube on Meta Quest | Quest VR Games*, https://www.meta.com/experiences/youtube/2002317119880945/ (last visited Jan. 8, 2026).

[31] *Id.*

[32] A March 2024 Duke University study reported that 33% of U.S. teens own a VR device, a figure that has been rising. Gisele Galoustian, *Dangers of the Metaverse and VR for U.S. Youth Revealed in New Study*, FAU (Oct. 22, 2024), https://www.fau.edu/newsdesk/articles/metaverse-dangers-youth-study.php. Another survey from mid-2022 showed that 26% of teens owned a VR headset; Joudi Assaf, *New XRA Survey Finds One in Five Teens Own a Virtual Reality Headset*, XR Assoc. (Jan. 10, 2025) https://xra.org/new-xra-survey-finds-one-in-five-teens-own-a-virtual-reality-headset/.

[33] Letter from Counsel for Fairplay to FTC, Re: Request for Investigation of Meta Platforms, Inc. for Violations of the Children's Online Privacy Protection Act in Horizon Worlds (Apr. 10, 2025), https://fairplayforkids.org/wp-content/uploads/2025/04/Fairplay-MHW-RFI-Final-Redacted-04.10.25.pdf.

[34] Letter from Senator Edward Markey and Congresswoman Kathy Castor to FTC (Apr. 10, 2025), https://www.markey.senate.gov/imo/media/doc/letter_to_ftc_on_meta_coppa_violations.pdf.

[35] *Hidden Harms: Examining the Whistleblower Allegations that Meta Buried Child Safety Research*, U.S. S. Comm. on the Judiciary, Subcomm. on Priv., Tech., and L. (Sep. 9, 2025), https://www.judiciary. senate.gov/committee-activity/hearings/hidden-harms-examining-whistleblower-allegations-that-meta-buried-child-safety-research.

is aware that the majority of VR users are under the age of 13, and that the prevalence of sexually inappropriate content is extremely high on Meta's VR platform Horizon Worlds and across all of the games offered through Meta's Quest VR headsets more generally.[36] Sattizahn testified that Meta's leadership, including c-suite executives, are aware of the risks to children on its VR platform but has not performed any research on how to make its VR platforms safe for children.[37] According to Meta employees and internal documents, Meta continues to suppress research demonstrating that children frequently encounter strangers and adults who sexually proposition them.[38] By turning a blind eye to the actual age of its users, egregious harm between adults and children worsens.

(c) Google announced on September 17, 2025 its incorporation of YouTube Shorts along with posts for other platforms like Instagram into its Discover feed. Google's Discover feed provides users "personalized content . . . and some AI-generated summaries" based on a user's internet activity. It further noted that it plans to extend its plans to other platforms in the future.

23. This Enterprise (without adequate warnings to parents, schools, and the American public) drives youth users and engagement and obfuscates the ability of parents to understand the full array of harms presented and to effectively monitor and limit their children's use of the various platforms and protect them from harm.

**2. Defendants Disseminate False and Misleading Messages About the Safety of Social Media for Youth Users**

24. Defendants have engaged in a repeated pattern of racketeering activity, including: committing fraud through corruption of an official proceeding by falsely testifying before

---

[36] Horizon World and Quest are operated by Meta Technologies, Inc., a subsidiary of, and controlled by, Meta Platforms, Inc.

[37] *Written Statement of Jason Sattizahn*, U.S. S. Comm. on the Judiciary, Subcomm. on Priv., Tech., and L. (Sep. 9, 2025), https://www.judiciary.senate.gov/imo/media/doc/6ccd5abd-cbb9-5107-d48d-b99e821eb244/2025-09-09%20-%20Testimony%20-%20Sattizahn1.pdf.

[38] Jon Swaine and Naomi Nix, *Meta suppressed research on child safety, employees say*, Wash. Post (Sep. 8, 2025), https://www.washingtonpost.com/investigations/2025/09/08/meta-research-child-safety-virtual-reality/.

Congress; and committing mail and/or wire fraud. Technology leaders consistently argue publicly that social media is safe for children, downplaying the risks if not denying them completely. Defendants have made the following non-exhaustive list of false and misleading representations to Congress, parents, and the American public:

**a. Meta**

25. During a public chat with Orrin Hatch at Brigham Young University on March 25, 2011, which was later published on YouTube, Mark Zuckerberg ("Zuckerberg"), CEO of Facebook, stated:

> One of the things that got people initially very comfortable with having a page on a service like Facebook is that we offer these extremely robust privacy controls . . . . ***We are*** really ***focused on safety, especially children's safety***. ***We take a lot of extra precautions to make sure it is a safe environment for them to use the service. We really try to build a safe environment***.[39]

(a) At the same event at Brigham Young University, Zuckerberg continued: "Right, and [children], they feel like Facebook is this really secure place and that it's a hundred percent safe, and um, we're always thinking about little and big things like that that we can do to keep it safe for, for the people who use our service."[40]

(b) When testifying before members of the U.S. Senate Committee on Commerce, Science, and Transportation on April 10, 2018 ("April 2018 Congressional session"), Zuckerberg was asked whether he worries about social media addiction as a problem for America's teens and answered:

> Article I. At Facebook specifically, I view our responsibility as not just building services that people like, but building services that are good for people and good for society as well. So we study a lot of effects of well-being of our tools and broader technology. . . .
>
> ***What we find in general is that if you are using social media in order to build relationships . . . you are sharing content with friends, you are interacting,***

---

[39] Todd Hollingshead, *Facebook's Zuckerberg at BYU: Be passionate about what you're doing*, BYU Univ. Commc'ns News (Mar. 24, 2011), https://news.byu.edu/news/facebooks-zuckerberg-byu-be-passionate-about-what-youre-doing.

[40] *Id.*

> ***then that is associated with all of the long-term measures of well-being that you would intuitively think of*** . . . .[41]

(c) At the same April 2018 Congressional session, Zuckerberg was asked whether his companies "[h]ire consulting firms to help them figure out how to get more dopamine feedback loops so that people don't want to leave the platform." He answered: "***No*** . . . that's not how we talk about this or how we set up our product teams. We want our products to be valuable to people, and if they're valuable, then people choose to use them."[42]

(d) At the same April 2018 Congressional session, when asked about protecting children, Zuckerberg said: "***I think protecting minors*** and protecting their privacy ***is extremely important, and we do a number of things on Facebook to do that already***."[43]

(e) On July 12, 2018, during a published interview with Kara Swisher, ("Swisher") of *The New York Times*, Zuckerberg discussed Facebook's core principles, stating: "There are really two core principles at play here. There's giving people a voice, so that people can express their opinions. Then, there's ***keeping the community safe, which I think is really important***."[44]

(f) On August 21, 2018, in a public post published on his Facebook page, Zuckerberg stated: "One of the most important responsibilities we have as a company is to keep people safe and stop anyone from abusing our service."[45]

(g) On December 23, 2020, the U.S. Senate Committee on the Judiciary posed questions to Facebook, including whether it could "determine whether increased use of its platform

---

[41] *Facebook, Social Media Privacy, and the Use and Abuse of Data, Transcript of Joint Hearing before the U.S. S. Comm. on Com., Science, and Transp. and the Comm. on the Judiciary, U.S. S.*, 115 Cong. 37, (Apr. 10, 2018), https://www.congress.gov/115/chrg/CHRG-115shrg37801/CHRG-115shrg37801.pdf.

[42] *Id.*

[43] *Id.* at 113.

[44] Kara Swisher, *Zuckerberg: The Recode Interview*, Vox (Oct. 8, 2018), https://www.vox.com/2018/7/18/17575156/mark-zuckerberg-interview-facebook-recode-kara-swisher.

[45] Mark Zuckerberg, Facebook (Aug. 21, 2018), https://www.facebook.com/zuck/posts/10105188590724391.

among teenage girls has any correlation with increased signs of depression [or anxiety] . . . ." Facebook answered: "no." In response to another question regarding what research Meta had conducted internally on the mental health impacts of social media use, Facebook responded: "The effects of social media are still being studied . . . ."[46]

(h) Zuckerberg testified before a Congressional committee again on March 25, 2021, speaking to members of the U.S. House of Representatives Committee on Energy and Commerce, Zuckerberg denied his platforms harm children:

> [Committee Member:] ***Do you believe that your platform harms children***?

> [Zuckerberg:] ***I don't believe so***. This is something that we study and we care a lot about. Designing products that improve peoples' well-being is very important to us. And what our products do is help people stay connected to people they care about, which I think is one of the most fundamental and important human things that we do, whether that's for teens or for people who are older than that.[47]

26. Meta's global head of safety Antigone Davis ("Davis") has similarly made misleading statements to parents and the American public about the safety of Meta's platforms for youth. For example, during her September 2021 testimony to the Senate,[48] she repeatedly touted the company's efforts to keep children safe while downplaying the risks:

> [Davis:] ***I work with internal teams and external stakeholders to ensure that Facebook remains a leader in online safety, including issues of bullying and combating child exploitation***. This is some of the most important work that I've done in my career. And I'm proud of the work that my team does every day. At Facebook, we take the privacy, safety and wellbeing of all those who use our platform very seriously, especially the youngest people on our services. . . . ***We work tirelessly to put in place the right policies, products, and precautions so they have a safe and positive experience. We have dedicated teams focused on youth safety, and we invest significant resources in protecting teens online. . . . We***

---

[46] Facebook, Inc. Responses to Questions for the Record from the Committee on the Judiciary's Nov. 17, 2020 Hearing: *Breaking the News: Censorship, Suppression, and the 2020 Election*, at 130-31 (Dec. 23, 2020), https://www.judiciary.senate.gov/imo/media/doc/Zuckerberg%20Responses%20to%20QFRs.pdf.

[47] *Disinformation Nation: Social Media's Role in Promoting Extremism and Misinformation, Transcript of Joint Hearing Before the Subcomm. on Commc'ns and Tech. and the Subcomm. on Consumer Prot. and Com. of the Comm. on Energy and Com. H.R.*, 117 Cong. 110 (Mar. 25, 2021), https://www.congress.gov/117/chrg/CHRG-117hhrg46925/CHRG-117hhrg46925.pdf.

[48] Full transcript can be found here: *Facebook Head of Safety Testimony on Mental Health Effects: Full Senate Hearing Transcript*, Rev (Sep. 30, 2021), https://www.rev.com/transcripts/facebook-head-of-safety-testimony-on-mental-health-effects-full-senate-hearing-transcript.

> ***require everyone to be at least 13 years of age on Facebook and Instagram***. When we learn that an underage user has created an account, we remove them from our platform. . . . ***For example, earlier this year, we announced that all users under 16 in the US will now be defaulted into a private account when they join Instagram***.
>
> [Senator Richard Blumenthal:] In an April 2021 report, which also has not been disclosed, it found a quarter of teen girls felt discouraged about their own life and worse about themselves, often or very often after using Instagram. Another undisclosed report, March 2020 found, "Social comparison is worse on Instagram." In part because its recommendations "enable never ending rabbit holes" and because it [is] "perceived as real life." ***I don't understand, Miss Davis, how you can deny that Instagram is[] exploiting young users for its own profits***.

27. As noted after the September 2021 grilling of Davis by the U.S. Senate by Josh Golin, executive director at Fairplay, a child advocacy group, "[f]or 2.5 hours, Ms. Davis offered evasions and misdirections, but refused to commit to a single substantive change or even greater transparency. . . . She also continued to push the fiction that Facebook's interest in Instagram Kids is driven by concern for children's safety when the company's own leaked documents make clear it's part of a larger strategy for growth and to compete with TikTok and Snap for young users."[49]

28. Meta's public claims of a "commitment to child protection" stand in contrast to its private actions and efforts to resist effective child protection regulation.[50] Numerous of Meta's own employees have reported that Meta has repeatedly suppressed and blocked research raising concerns about its platforms and child safety.[51] As Frances Haugen testified before Congress on October 5, 2021:

---

[49] Samantha Murphy Kelly, *Facebook grilled by Senate over company's impact on kids*, CNN Bus. (Sep. 30, 2021), https://edition.cnn.com/2021/09/30/tech/facebook-senate.

[50] For example, Meta funds the Digital Childhood Alliance, which is leading efforts to move responsibility for age verification away from Meta to "app stores" run by operating systems. Emily Birnbaum, *Meta Clashes With Apple, Google Over Age Check Legislation*, Bloomberg (July 25, 2025), https://www.bloomberg.com/news/articles/2025-07-25/meta-clashes-with-apple-google-over-child-age-check-legislation.

[51] Kenichi Serino, *Meta Whistleblowers testify on child safety research before Senate Judiciary Committee*, PBS News (Sep. 9, 2025), https://www.pbs.org/newshour/politics/watch-live-meta-whistleblowers-testify-on-child-safety-research-before-senate-judiciary-committee; David Ingram and Julie Tsirkin, *Former Meta employees say they saw child abuse in VR before company blocked research*, NBC News (Sep. 9, 2025), https://www.nbcnews.com/tech/tech-news/meta-whistleblower-research-kids-vr-former-employees-stock-rcna230131; *Statement of Frances Haugen*, U.S. S. Comm. on Comm., Science and Transp., Subcomm. on Consumer Prot., Prod.

> Facebook wants you to believe that the problems we're talking about are unsolvable. They want you to believe in false choices. They want you to believe you must choose between connecting with those you love online and your personal privacy. That in order to share fun photos of your kids with old friends, you must also be inundated with misinformation. They want you to believe that this is just part of the deal. I am here to tell you today that's not true. These problems are solvable. ***A safer, more enjoyable social media is possible. But if there is one thing that I hope everyone takes away from these disclosures it is that Facebook chooses profit over safety every day – and without action, this will continue***.

29. On November 7, 2023, former Facebook engineer Arturo Bejar testified about Meta's knowledge of the harm its platforms cause to children and teens, and its failure to take action:[52]

> In a carefully designed survey by Instagram in 2021, we found that ***one in eight kids age 13 to 15 years old***, experienced unwanted sexual advances ***in the last seven days***. This is unacceptable and my work has shown that it doesn't need to be this way.
>
> A few years later, my 14 year old daughter joined Instagram. She and her friends began having awful experiences including repeated unwanted sexual advances, harassment. She reported these incidents to the company and it did nothing in large part because of what I learned as her father. On October of [2019], I returned to Facebook this time as a consultant with Instagram's wellbeing team. ***We tried to set goals based on the experiences of teens themselves. Instead, the company wanted to focus on enforcing its own narrowly defined policies. Regardless of whether that approach reduced the harm that teens were experiencing, I discovered that most of the tools for kids that we had put in place during my earlier time at Facebook had been removed. I observed new features being developed in response to public outcry, which were in reality, kind of a placebo, a safety feature in name only to placate the price and regulators***.

30. And, again on September 9, 2025, former Meta researchers Sattizahn and Savage testified that Meta is aware that its products present significant risks to child safety.[53] Sattizahn further testified that Meta's lawyers regularly prevented and manipulated research into child safety:

---

Safety, and Data Sec. (Oct. 4, 2021), https://www.commerce.senate.gov/services/files/FC8A558E-824E-4914-BEDB-3A7B1190BD49.

[52] The full testimony is here: Justin Hendrix, *Transcript: Senate Hearing on Social Media and Teen Mental Health with Former Facebook Engineer Arturo Bejar*, Tech Policy Press (Nov. 8, 2023), https://www.techpolicy.press/transcript-senate-hearing-on-social-media-and-teen-mental-health-with-former-facebook-engineer-arturo-bejar/.

[53] *Hidden Harms: Examining the Whistleblower Allegations that Meta Buried Child Safety Research*, *supra* n.35.

> In spaces Meta deemed as "sensitive" (including child harm and emotional damage), Meta's lawyers reviewed all research at every stage of development, implementation, analysis, and the 2 sharing of findings to those who need the information. In fact, when Meta's lawyers reviewed my own work at Meta, I was often told that:
>
> - Entire studies or methods could not be performed because it would be "risky" for Meta to have knowledge of the data collected;
> - Research studies could not continue until changes to the study were made to collect less incriminating data about Meta's products;
> - Data could not be analyzed in specific ways, as it ran the risk of producing results that could make Meta's products look harmful to users;
> - How reports and analyses needed to be written, framed, or otherwise presented internally, all to limit risk to Meta; and
> - To whom reports and findings could be shared to internally.
>
> With rare exceptions, every research report I published at Meta after the 2021 Frances Haugen whistleblower disclosures was reviewed and had results edited by Meta's lawyers.

31. Meta is also aware that Instagram is exacerbating negative self-image for teen users. For example, internal Meta research surveying 1,149 teens from 2023-2024 found that for teens who report frequently experiencing body dissatisfaction, Meta shows up to three times more "eating disorder adjacent" and body-focused content than other teens.[54]

32. Additionally, Meta consistently releases in its "Community Standards" far lower rates of violations occurring on its platforms including hate speech, bullying, harassment, and threats of violence than actually occur.

**b. TikTok**

33. TikTok has also disseminated false and misleading messages publicly regarding the harms and benefits of its social media platforms. TikTok presents itself as a leader in teen safety. For instance, on October 26, 2021, Michael Beckerman, TikTok's Vice President and Head of

[54] Jeff Horwitz, *Exclusive: Instagram shows more 'eating disorder adjacent' content to vulnerable teens, internal Meta research shows*, Reuters (Oct. 20, 2025), https://www.reuters.com/business/instagram-shows-more-eating-disorder-adjacent-content-vulnerable-teens-internal-2025-10-20/; *see also People Disagree Content Seen by Teens Reporting Different Levels of Body Dissatisfaction After Viewing Content on IG*, www.reuters.com/investigates/special-report/assets/usa-tech-meta-teens/Viewing-Content-on-IG_Redacted.pdf.

Public Policy in the Americas, testified before the U.S. Senate Committee on Commerce, Science, and Transportation and stated: "Our mission is to inspire creativity and bring joy, and ***that mission is the foundation for our*** privacy and ***safety policies that aim to protect and promote the well-being of minors on the app***."[55]

34. At the same hearing, Beckerman testified: "***We have proactively implemented*** privacy and ***safety protections to promote the well-being of children and teenagers***, and we continue to work on changes to support age-appropriate experiences on our platform."[56]

35. On March 23, 2023, TikTok CEO Shou Chew ("Chew") testified before the U.S. House Committee on Energy and Commerce. On behalf of TikTok, Chew testified: "Safety and wellness – in particular for teens – is a core priority for TikTok" and "to help teens safely manage their experience, TikTok provides them with age-appropriate settings and controls."[57] He lauded TikTok's safety monitoring: "TikTok rigorously screens content for indications of potential predatory or abusive behavior,"[58] and on parental controls, Chew stated: "We have a suite of family pairing tools so that parents can participate in their teens' experience, and make the choices that are right for their family."[59] He also asserted that TikTok puts safety before profit: "We launch great products with a safety-by-design mentality, even if those features limit our monetization opportunities."[60]

---

[55] *Protecting Kids Online: Snapchat, TikTok, and YouTube: Hearing Before the Subcomm. on Consumer Prot., Prod. Safety, and Data Sec.*, 117 Cong. (Oct. 26, 2021) (testimony of Michael Beckerman, Vice President and Head of Public Policy), https://www.commerce.senate.gov/services/files/8C751FF4-A1FD-4FCA-80F6-C84BEB04C2F9.

[56] *Id.*

[57] *Written Testimony of Shou Chew, Chief Executive Officer, TikTok Inc.*, U.S. House Committee on Energy and Commerce (Mar. 23, 2023), https://www.congress.gov/118/meeting/house/115519/witnesses/HHRG-118-IF00-Wstate-ChewS-20230323.pdf.

[58] *Id.*

[59] Transcript of hearing, *TikTok: How Congress Can Safeguard American Data Privacy and Protect Children from Online Harms*, U.S. H. Comm. on Energy and Com. (Mar. 23, 2023), https://www.congress.gov/118/meeting/house/115519/documents/HHRG-118-IF00-Transcript-20230323.pdf.

[60] *Written Testimony of Shou Chew, Chief Executive Officer, TikTok Inc.*, *supra* n.57.

36. On January 31, 2024, Chew testified before the U.S. Senate Committee on the Judiciary, and again attested to TikTok's commitment to safety for youth: "TikTok is deeply committed to ensuring that its platform provides a safe and positive experience, especially for people under the age of 18."[61] Chew again touted that "TikTok promotes a safe and age-appropriate experience for teen users between ages 13 through 17 by utilizing a multi-faceted, multi-level approach" and that its parental controls allow parents or guardians to set specific controls over a variety of features for youth.[62] He further testified that TikTok "[t]ake[s] a zero-tolerance approach to [CSAM] by investing in our teams and technology to help ensure we swiftly detect, remove, and report this content"[63] and categorically attested: "[TikTok] do[es] not allow content that may put young people at risk of exploitation, or psychological, physical, or developmental harm."[64]

37. TikTok offers further assurances that its platform is safe for youth in statements to the public. In October 2024, TikTok spokesperson Alex Haurek falsely stated on behalf of the company: "We have robust safeguards, which include proactively removing suspected underage users, and we have voluntarily launched safety features such as default screentime limits, family pairing, and privacy by default for minors under 16."[65]

38. In fact, TikTok and its executives are aware that its product is designed to be addictive to youth and has not prioritized safety for its youth users.[66] For instance, in working towards its goal to maximize youth user engagement at all costs, TikTok has recommendation

---

[61] *Big Tech and the Online Child Sexual Exploitation Crisis*, U.S. Senate Comm. on the Judiciary (Jan. 31, 2024) at 2, https://www.judiciary.senate.gov/imo/media/doc/2024-01-31_-_qfr_responses_-_chew.pdf.

[62] *Id.*

[63] *Written Testimony of Shou Chew, Chief Executive Officer, TikTok Inc.*, *supra* n.57.

[64] *Big Tech and the Online Child Sexual Exploitation Crisis*, *supra* n.61.

[65] Bobby Allyn et al., *TikTok executives know about app's effect on teens, lawsuit documents allege,* NPR (Oct. 11, 2024), https://www.npr.org/2024/10/11/g-s1-27676/tiktok-redacted-documents-in-teen-safety-lawsuit-revealed.

[66] *Id.*

algorithms that begin tailoring to user behavior extremely quickly. One study showed that TikTok's recommendation system began promoting self-harm and eating disorder content to 13-year-olds within 30 minutes on the platform.[67] In another investigation, researchers registered for the app posing as 13-year-olds and were served thousands of videos about weight loss within weeks of joining the platform, including tips on how to consume less than 300 calories per day.[68] TikTok has failed to warn parents, schools, and the public about the harms to youth from using its platform.

39. TikTok executives are aware that certain safety tools it has touted to users as helping youth to address overuse "would have a negligible reduction in screen time."[69]

**c. YouTube**

40. During the October 26, 2021 hearing before the U.S. Senate Committee on Commerce, Science, and Transportation, YouTube Vice President of Government Affairs & Public Policy, Leslie Miller ("Miller"), testified: "***Ensuring the safety of children is not only the right thing to do, it also helps us to earn the trust of parents, who see that we are building a safe environment for kids and families***."[70]

41. Miller further stated: "[Users] are introduced to a diversity of content that isn't based on a particular network that they are a part of. In so doing, there may be additional videos

---

[67] Sapna Maheshwari, *Young TikTok users quickly encounter problematic posts, researchers say*, N.Y. Times (Dec. 14, 2022), https://www.nytimes.com/2022/12/14/business/tiktok-safety-teens-eating-disorders-self-harm.html.

[68] Tawnell D. Hobbs et al, *'The corpse bride diet': How TikTok inundates teens with eating-disorder videos*, Wall St. J. (Dec. 17, 2021), https://www.wsj.com/tech/how-tiktok-inundates-teens-with-eating-disorder-videos-11639754848.

[69] Bobby Allyn et al., *TikTok executives know about app's effect on teens, lawsuit documents allege*, *supra* n.65.

[70] *Protecting Kids Online: Snapchat, TikTok, and YouTube: Hearing Before the S. Com. Comm. Subcomm. on Consumer Prot., Prod. Safety, and Data Sec.*, 117 Cong. (Oct. 26, 2021) (written testimony of Leslie Miller, Vice President, YouTube Gov. Affairs & Public Policy), https://www.commerce.senate.gov/services/files/2FBF8DE5-9C3F-4974-87EE-01CB2D262EEA.

that are recommended to them based on some signals. ***But those signals will be overrided [sic] if they – to make sure that we are not recommending harmful content*.**”[71]

42. During the same hearing, when asked what steps YouTube takes to eliminate hurtful body image content from its platform, Miller stated: “***We prohibit content that promotes or glorifies things such as eating disorders***.”[72]

43. In further comments before the committee, Miller asserted: “We have made significant investments over the past few years in policies, technology, and teams that help provide kids and families with the best protections possible.”[73]

44. Google’s public claims to the effect that YouTube is “a vibrant community of kids and family content creators”[74] which is “giving kids and teens a safer experience online”[75] stand in contrast to its private actions and efforts to resist effective child protection regulation.

**d. Snapchat**

45. A representative for Snap also testified before the U.S. Senate Committee on Commerce, Science, and Transportation on October 26, 2021. When asked what steps Snap takes to eliminate hurtful body image content from its platform, Jennifer Stout (“Stout”), Vice President of Global Public Policy, stated: “[***W]e don’t allow unvetted, unmoderated content from being surfaced up to our users***.”[76]

---

[71] *Transcript of Hearing before the Comm. on Com., Science, and Transp. U.S. S. and the Subcomm. on Consumer Prot., Prod. Safety, and Data Sec. U.S. S.*, 115 Cong. 37 (Oct. 26, 2021), https://www.congress.gov/117/chrg/CHRG-117shrg54901/CHRG-117shrg54901.pdf.

[72] *Id.* at 22.

[73] *Protecting Kids Online: Snapchat, TikTok, and YouTube* (written testimony of Leslie Miller), *supra* n.70.

[74] James Beser, *Our Responsibility Approach to Protecting Kids and Families on YouTube*, YouTube Official Blog (Oct. 25, 2021), https://blog.youtube/news-and-events/our-responsibility-approach-protecting-kids-and-families-youtube/.

[75] Mindy Brooks, *Giving kids and teens a safer experience online*, Google (Aug. 10, 2021), https://blog.google/technology/families/giving-kids-and-teens-safer-experience-online/.

[76] *Id.* at 21.

46. In response to Senator Lee's comments during the hearing that content on Snapchat is not appropriate for minor youth, Stout replied: "While I would agree with you, tastes vary when it comes to the kind of content that is promoted on Discover, ***there is no content there that is illegal. There is no content there that is hurtful***."[77]

47. Stout went on to say: "[O]n a platform like SnapChat, there is no broadcast disinformation or hate speech, and that's why I think SnapChat is, in fact, a very appealing place for advertisers because they know their advertisements will be placed next to safe content."[78]

48. When asked by Senator Blumenthal whether Snap had conducted any research that showed social media can have a negative effect on children's mental health and whether its application promotes addiction-like use, Stout answered: "[S]ome of the research that we did showed that 95% of users say that Snapchat makes them happy."

49. Stout asserted: "We make no effort – and have no plans – to market to children, and individuals under the age of 13 are not permitted to create Snapchat accounts"[79] but also that "***the content that appears on SnapChat is appropriate for an age group of 13 and above***."[80]

### 3. Defendants Use Industry Groups to Disseminate Their False and Misleading Messaging to Parents and the American Public

50. Defendants used Industry groups in connection with the Enterprise to collectively carry out their Scheme of targeting and expanding their youth user base by disseminating deceptive information about the safety of their social media platforms for youth.

---

[77] *Id.* at 26.

[78] *Id.* at 24.

[79] *Protecting Kids Online: Snapchat, TikTok, and YouTube: Hearing Before the Subcomm. on Consumer Prot., Prod. Safety, and Data Sec.*, 117 Cong. (Oct. 26, 2021) (testimony of Jennifer Stout, Vice President of Global Public Policy, Snap Inc.), https://www.commerce.senate.gov/services/files/0AACA9BA-49C8-4AC3-8C2E-E62ACC3F73BC.

[80] *Id.* at 25.

51. Defendants used advocacy groups and professional associations as vehicles to reach policymakers and the public. Defendants exerted influence and effective control over these groups by providing them directly with major funding.

52. Defendants funded Industry Groups in order to ensure supportive messages from these seemingly neutral and credible third parties; and their funding did, in fact, ensure such supportive messages. They have used these Industry Groups, as part of the Enterprise, to commission, edit, and arrange for favorable messaging misrepresenting the benefits of their platforms for youth.

53. On information and belief, Defendants took an active role in guiding, reviewing, and approving many of the false statements made by the Industry Groups. By funding, directing, editing, approving, and distributing these messages, Defendants exercised control over and adopted their false and deceptive messages and acted in concert with the Industry Groups and through the Industry Groups to deceptively promote the idea that social media is healthy and beneficial for youth.

**a. NetChoice**

54. NetChoice is an industry-backed professional association Industry Group with systematic connections and interpersonal relationships with Defendants. As a member-based organization, the overwhelming majority of its funding has come from the dues of its members, which have included Google, Meta, Snapchat, and TikTok.[81] Google has listed NetChoice as one of the organizations "that receive the most substantial contributions from Google's U.S. Government Affairs and Public Policy team."[82]

---

[81] *NetChoice: About Us*, https://netchoice.org/about/ (last visited Jan. 12, 2026); NetChoice, IRS Form 990 (2019), https://projects.propublica.org/nonprofits/organizations/271716101; Cristiano Lima, *Inside the power struggle over the high-stakes hearing with top tech CEOs*, Politico (July 20, 2020), https://www.politico.com/news/2020/07/20/apple-google-amazon-facebook-congress-hearing-373218.

[82] *Trade Association and Membership Organizations*, Google (2022), https://kstatic.googleusercontent.com/files/ddfc97f01d89290e37bc52abdd9704bc3314ec5598bebe9676c64cd7a5ba1a719acaf069c1f9c218986e507f58bf3b50c750119c778cb4e88e99f3fb4dd904b4.

55. NetChoice engages in lobbying and other activities to protect Defendants' interests and ability to continue targeting youth with its harmful social media platforms. It is considered "one of the tech industry's most aggressive lobbying forces in Washington."[83] From 2020 through 2022, it has spent over $4.9 million in federal lobbying expenses.[84]

56. NetChoice has gone to great lengths to protect its members, including Defendants, from accountability for their actions that target and harm children. In December 2022, NetChoice filed suit against the California Attorney General challenging the passage of the California Age-Appropriate Design Code Act (AB 2273) in order to ensure Defendants' freedom to target children with detrimental material.[85] In its suit, NetChoice specifically defends algorithms such as those employed by Defendants, referred to in AB 2273 as "dark patterns," which "lead or encourage children to," among other things, "take any action that the business knows, or has reason to know, is materially detrimental to the child's physical health, mental health, or well-being."[86]

57. NetChoice has also used its standing as a seemingly neutral professional organization to lobby state legislatures opposing legislation such as AB 2273 and similar statutes in other states.[87]

---

[83] Cristiano Lima, *Inside the power struggle over the high-stakes hearing with top tech CEOs*, *supra*, n.81.

[84] U.S. Senate LDA, *Registrations & Quarterly Activity*, NetChoice, https://lda.senate.gov/filings/public/filing/search/?registrant=&registrant_country=&registrant_ppb_country=&client=netChoice&client_state=&client_country=&client_ppb_country=&lobbyist=&lobbyist_covered_position=&lobbyist_conviction_disclosure=&lobbyist_conviction_date_range_from=&lobbyist_conviction_date_range_to=&report_period=&report_year=&report_dt_posted_from=&report_dt_posted_to=&report_amount_reported_min=&report_amount_reported_max=&report_filing_uuid=&report_house_doc_id=&report_issue_area_description=&affiliated_organization=&affiliated_organization_country=&foreign_entity=&foreign_entity_country=&foreign_entity_ppb_country=&foreign_entity_ownership_percentage_min=&foreign_entity_ownership_percentage_max=&search=search#js_searchFormTitle (last visited Jan. 8, 2026).

[85] Complaint for Declaratory and Injunctive Relief, *NetChoice, LLC v. Bonta*, No. 5:22-cv-08861-VKD (N.D. Cal. Dec. 14, 2022).

[86] *Id.*; Cal. Civ. Code §1798.140(1).

[87] *See, e.g.*, Letter from Carl Szabo to Md. Gen. Assemb. (Mar. 7, 2023), https://netchoice.org/netchoice-opposition-to-maryland-sb-844-blocking-teens-from-the-internet/; Letter from Zachary Lilly to Tenn. Gen. Assemb. Senate Com. and Labor Comm.

58. NetChoice speaks out publicly in favor of Defendants and pushes misrepresentations about the value of Defendants' social media platforms for children and their efforts. For instance, NetChoice has taken the position that social media ought to be expanded for youth under 13 years old and that Facebook specifically can be trusted with providing adequate protection to young children using the platform. "[S]ocial networks can deliver value to pre-teens while also controlling elements of the experience that require parental supervisions."[88]

59. It has taken the position that any limitations on the types of algorithms used by Defendants to target youth would be "potentially harmful to young people" and "have a negative impact on children and teenagers' ability to use . . . technology . . . in beneficial ways."[89]

**b. Computer and Communications Industry Association**

60. The CCIA is another Industry Group with systematic connections and interpersonal relationships with Defendants. CCIA is a nonprofit trade association with Google, Meta, and Snap as participating members.

61. Google is a controlling member of CCIA. Mark Isakowitz, Google's Vice President of Government Affairs and Public Policy (United States and Canada), is a board member at CCIA. The board members of CCIA presumably oversee the policy agenda for the organization and control the issues for which CCIA advocates. CCIA is also listed by Google as one of the organizations "that receive the most substantial contributions from Google's U.S. Government Affairs and Public Policy Team."[90]

62. CCIA has lobbied the federal government on behalf of Defendants and their ability to create algorithms that maximize engagement from young users. From 1998 through 2021,

---

(Mar. 20, 2023), https://netchoice.org/netchoice-testimony-against-tennessee-sb-0138-for-first-amendment-parental-rights/.

[88] *Adding a Shallow End to the Social Network Swimming Pool*, NetChoice (June 5, 2012), https://netchoice.org/adding-a-shallow-end-to-the-social-network-swimming-pool/.

[89] Letter from Jennifer Huddleston to Cal. Senate Appropriations Comm. (Aug. 2, 2022), https://netchoice.org/wp-content/uploads/2022/08/NetChoice-Opposition-to-CA-AB-2408-Jennifer-Huddleston.pdf.

[90] *Trade Association and Membership Organizations*, *supra* n.82.

CCIA has spent over $8.7 million in federal lobbying expenditures, including to protect Defendants' ability to continue targeting and addicting youth through their platforms.[91] In January 2023, CCIA submitted formal comments to the FTC opposing a Petition for Rulemaking to initiate rulemaking to create protections for children on the internet and regulate online design features that target youth and seek to maximize young users' engagement with online platforms such as Defendants'.[92] In its opposition, CCIA argued, among other things, that Defendants' algorithms designed to encourage bottomless scrolling are beneficial because they drive user engagement, which is "a desirable goal for users and creators" and "has led to innovations that benefit [users]."[93] However, CCIA's true motive in filing the opposition is barely concealed: one of the benefits described includes "boosting ad revenue" for developers such as Defendants.

63. Through its public statements and lobbying, CCIA promotes falsehoods about Defendants' efforts to protect children on their platforms in order to dissuade lawmakers from regulating social media platforms' unfettered access to youth. For instance, in a letter to a South Carolina joint legislative committee, CCIA asserted that "there are a number of efforts among our members to incorporate protective design features into their websites and platforms."[94]

---

[91] U.S. Senate LDA, *Registrations & Quarterly Activity*, Comput. & Commc'ns Indus. Ass'n, https://lda.senate.gov/filings/public/filing/search/?registrant=&registrant_country=&registrant_ppb_country=&client=Computer+%26+Communications&client_state=&client_country=&client_ppb_country=&lobbyist=&lobbyist_covered_position=&lobbyist_conviction_disclosure=&lobbyist_conviction_date_range_from=&lobbyist_conviction_date_range_to=&report_period=&report_year=&report_dt_posted_from=&report_dt_posted_to=&report_amount_reported_min=&report_amount_reported_max=&report_issue_area_description=&affiliated_organization=&affiliated_organization_country=&foreign_entity=&foreign_entity_country=&foreign_entity_ppb_country=&foreign_entity_ownership_percentage_min=&foreign_entity_ownership_percentage_max=&search=search (last visited Jan. 8, 2026).

[92] Comments of the Comput. & Commc'ns Indus. Ass'n, (CCIA), *In re Petition of the Center for Digital Democracy, Fairplay, et al. for Rulemaking to Prohibit the Use on Children of Design Features that Maximize for Engagement*, No. FTC-2022-0073 (FTC Jan. 3, 2023), https://ccianet.org/wp-content/uploads/2023/01/CCIA-Comment-to-FTC-on-Online-Design-Practices.pdf.

[93] *Id.* at 5.

[94] Letter from Khara Boender to Joint Citizens and Legis. Comm. on Child., RE: SB 591 – Children's Default to Safety Act (*Oppose*) (Mar. 28, 2023), https://ccianet.org/wp-content/uploads/2023/03/2023-3-24_CCIA-Comments-on-SC-SB-591.pdf.

64. In other public statements, CCIA acknowledges that Defendants are working together while spreading falsehoods about their efforts to protect children. "Currently, digital service providers are working collaboratively to advance online safety by developing products and tools to further the goal of child safety, including incorporating protective design features into their websites and platforms," CCIA asserted in a March 2023 press release available on its website.[95] CCIA's State Policy Director has directly promoted these falsehoods, stating: "'Protecting children and prioritizing online safety is a top concern for digital service providers.'"[96] In opposing legislative efforts to protect children in connection with Virginia's SB 854, Colorado's SB 158, and New York's S.7694A/A.8148A, the CCIA has repeatedly assured that Defendants have "robust protective design features" in place to ensure the safety of children on social media platforms and refers to current safety concern as a "moral panic," all of which misleads the public into believing the platforms are safer than they are.

65. CCIA and NetChoice have worked together, along with and on behalf of Defendants, to resist legislation that would regulate social media networks in ways that could offer more protections to youth users.[97]

**c. Information Technology Industry Council**

66. The ITI is another Industry Group with systematic connections and interpersonal relationships with Defendants. ITI is a trade association and lobbyist with Google, Meta, and Snap as participating and funding members. ITI is listed by Google as one of the organizations "that

---

[95] *CCIA Calls for Balance Regarding Age-Appropriate Design Code Legislation Being Proposed in Several States*, Comput. & Commc'ns Indus. Ass'n. (Mar. 1, 2023), https://ccianet.org/news/2023/03/ccia-calls-for-balance-regarding-age-appropriate-design-code-legislation-being-proposed-in-several-states/.

[96] *Id.*

[97] *See, e.g.*, Complaint for Declaratory and Injunctive Relief, *NetChoice LLC v. Paxton*, No. 1:21-cv-00840-RP (W.D. Tex. Sep. 22, 2021); Complaint for Declaratory and Injunctive Relief, *NetChoice LLC v. Uthmeier*, No. 4:21-cv-00220-RH-MAF (N.D. Fla. May 27, 2021).

receive[s] the most substantial contributions from Google's U.S. Government Affairs and Public Policy Team."[98]

67. Adam Kovacevich ("Kovacevich"), who previously led Google's U.S. policy strategy and external affairs team for 12 years, has served as a board member for ITI.

**d. TechNet**

68. TechNet is another Industry Group with systematic connections and interpersonal relationships with Defendants. TechNet is a trade association with Google, Meta, and Snap as funding members. In 2020, TechNet brought in over $4.2 million in membership dues.[99]

69. Kent Walker, President of Global Affairs and Chief Legal Officer at Google, serves on the Executive Council of TechNet, which controls TechNet's policy positions and direction.[100]

70. TechNet has a strong lobbyist presence on Capitol Hill and has been called "[Silicon] Valley's strongest fundraising network and lobbying voice in Washington."[101]

71. TechNet, along with NetChoice, CCIA, and ITI, advocates for tech companies such as Defendants to be subject to as little regulation governing their actions as possible. In their *amicus* brief supporting Google before the Supreme Court, these Industry Groups asserted the benefits of YouTube's algorithms, which serve to provide endless and increasingly salacious content to youth the longer they watch.[102] According to the *amicus* brief, algorithms improve efficiency, "unlock[] the value of digital services" for users and creators, and provide a "seamless, satisfying user experience."[103] The brief misleadingly asserts that the algorithms abide by content

---

[98] *Trade Association and Membership Organizations*, *supra* n.82.

[99] Brian Schwartz, *Silicon Valley Bank ex-CEO backed Big Tech lobbying groups that targeted Dodd-Frank, sought corporate tax cuts*, CNBC (Mar. 16, 2023), https://www.cnbc.com/2023/03/16/silicon-valley-bank-ex-ceo-greg-becker-backed-big-tech-lobbying-groups.html.

[100] TechNet, Kent Walker, https://www.technet.org/executive-council/kent-walker/ (last visited Jan. 8, 2026).

[101] *Meet the 20 Tech Insiders Defining the 2016 Campaign*, Wired (Jan. 19, 2016), https://www.wired.com/2016/01/silicon-valley-influence-2016-election/.

[102] *Amicus* Brief, *Gonzalez v. Google LLC*, No. 21-1333, 2023 WL 387447 (U.S. Jan. 19, 2023).

[103] *Id.* at 13-15.

moderation policies that "generally prohibit, among other things, violent or dangerous content, spam, bullying, harassment, and sensitive or graphic content, which may include content about self-harm or harm to children."[104]

**e. Chamber of Progress**

72. Chamber of Progress is another Industry Group with systematic connections and interpersonal relationships with Defendants. Google and Meta are both founding members of the organization. Chamber of Progress is listed by Google as one of the organizations "that receive[s] the most substantial contributions from Google's U.S. Government Affairs and Public Policy Team."[105]

73. Chamber of Progress is a technology industry coalition focused on public policy advocacy. On issues impacting social media companies, it has exclusively aligned itself with social media companies and has filed *amicus* briefs in support of Meta. It has publicly advocated against states that have attempted to regulate social media use for youth, asserting: "[s]tudies have shown that social media can be a positive factor in children's lives."[106]

74. Kovacevich, who previously led Google's U.S. policy strategy and external affairs team, is the founder and CEO of Chamber of Progress.

**D. Social Media Has Harmed Marin County Youth**

75. Marin County has been directly impacted by the youth mental health crisis in its community.

76. As Marin County youth use of Defendants' platforms has increased, Marin County youth mental, emotional, and social health has declined.

---

[104] *Id.* at 17-18.

[105] *Trade Association and Membership Organizations*, *supra* n.82.

[106] *See, e.g.*, Chamber of Progress, *Utah Bills Require Parental Control of Teen Social Media* (Mar. 23, 2023), https://progresschamber.org/utah-bills-require-parental-control-of-teen-social-media/.

77. Youth in Marin County have suffered from increased rates of depression and anxiety since the proliferation of social media.[107] According to a 2023-2025 survey of 7th, 9th, and 11th graders in Marin County, between 22% and 32% of students felt so sad or hopeless almost every day for at least two weeks that they stopped doing their usual activities. Between 10% and 15% of students reported seriously considering suicide.[108]

78. A 2024 youth-led survey by the Marin County AIM Ideas Lab asked teens about the prevalence of mental health issues among their peers. The survey found that nearly 90% of local teens had a peer experiencing anxiety, more than 86% had a peer with high stress or burnout, and over 70% had a peer with depression or low self-esteem.[109] More than 70% of the respondents reported eating disorders in their peer group, and 67% reported body dysmorphia among their peers. Disturbingly, more than half of respondents reported self-harm behavior in their social circles, and nearly 45% noted suicidal thoughts among peers. Survey respondents further reported that posting on social media had a significant negative impact on their mental health (43.5% somewhat negative, 7.3% very negative). Even worse was the reported impact of scrolling on social media (53.8% somewhat negative, 22.3% very negative).[110]

79. Suicide was the second leading cause of death of children and young people ages 10–24 in California in 2020.[111] In Marin County, although youth between the ages of 15-24 represent 10% of the population, they represent 44% of emergency room visits, 36% of

---

[107] CalSCHLS, *California Healthy Kids Survey, Marin County Secondary 2023-2025 Main Report*, *supra* n.2.

[108] *Id.* at 5.

[109] AIM Youth Mental Health, *AIM Ideas Lab Youth Survey 2024 Marin* County, *supra* n.1 at 7.

[110] *Id.* at 11.

[111] *AAP-AACAP-CHA Declaration of a National Emergency in Child and Adolescent Mental Health*, Am. Acad. Pediatrics (Oct. 19, 2021), https://www.aap.org/en/advocacy/child-and-adolescent-healthy-mental-development/aap-aacap-cha-declaration-of-a-national-emergency-in-child-and-adolescent-mental-health/.

hospitalizations resulting from suicide attempts, and 10% of the suicide deaths.[112] In one tragic instance, a Marin County teenager died by suicide after, according to her family, she became addicted to social media, and the apps fed her directions on self-harm and suicide.[113]

80. Youth in Marin County also report high levels of online bullying and harassment. Nearly 30% of seventh-grade respondents to a 2023-2025 survey reported cyberbullying in the past 12 months; 22% and 21% of ninth and eleventh graders, respectively, reported the same.[114] In one recent incident, Novato Police released information regarding the distribution of embarrassing and illicit images of Marin County teens collected via the underage victims' social media accounts.[115] In a 2024 incident, internet bullying motivated a physical assault that injured two girls at a Novato middle school.[116] Videos of the attack were then posted on social media.[117] In 2024, Mill Valley police investigated a social media account dedicated to bullying, including one post of a girl engaged in a sex act. [118] In 2020, a string of anti-Semitic and violent posts on Instagram and TikTok circulated among students at a Marin County high school containing

---

[112] Marin County Suicide Prevention Collaborative, Annual Report 2020-2021, https://www.marinhhs.org/sites/default/files/files/servicepages/2021_09/year_one_sp_annual_report_final_2021.pdf.

[113] Keri Brenner, *Bay Area parents who lost daughter praise social media verdict*, *supra* n.3.

[114] CalSCHLS, *California Healthy Kids Survey, Marin County Secondary 2023-2025 Main Report*, *supra* n.2 at 3.

[115] Phil Mayer, *Social media account offered 'embarrassing and illicit' images of Marin County teens*, one arrested, *supra* n.5.

[116] Don Carney and Marion Kregeloh, *Marin Voice: Schools need new approach to smartphones, social media*, Marin Independent Journal (July 21, 2024), https://www.marinij.com/2024/07/21/marin-voice-schools-need-new-approach-to-smartphones-social-media/.

[117] Keri Brenner, *Marin grand jury urges better Novato school security*, Marin Independent Journal (Apr. 14, 2025), https://www.marinij.com/2025/04/14/marin-grand-jury-urges-better-novato-school-security/.

[118] *Marin 911: Police examining two social media posts, one of a sex bullying nature; another describing multiple ways to kill a fellow student*, Marin Scope Community Newspapers (Apr. 3, 2024), https://marinlocalnews.com/marin-911-police-examining-two-social-media-posts-one-of-a-sex-bullying-nature-another-describing-multiple-ways-to-kill-a-fellow-student/.

Holocaust denial, homophobia, and threats of rape directed at students.[119] As early as 2016, a Marin County Civil Grand Jury concluded that cyberbullying was pervasive in Marin middle and high schools, and said Marin schools reported more incidents than the California average during the period it reviewed.[120] As these incidents show, the problem has only grown with the rise of social media.

81. Additionally, an increasing number of Marin County youth have been acting out as a result of the decline and harm Defendants caused to youths' mental, emotional, and social health. Social media trends, such as the "devious lick" challenge on TikTok, have resulted in Marin County youth vandalizing and otherwise destroying school property.[121] A recent set of incidents in Marin County involved youth shooting projectile gel balls known as "Orbeez" at other students and community members as a direct result of the "Orbeez Challenge" trend on TikTok.[122]

82. Social media has also amplified threats of violence against students. In December 2021, Marin County law enforcement increased patrols around Marin County schools in response to a series of TikTok posts threatening school shootings across the county.[123] In another instance, graffiti containing school shooting threats was found at Redwood High School

---

[119] Maya Mirsky, *Marin students again targeted with antisemitic social media posts*, J. The Jewish News of Northern California (Nov. 19, 2020), https://jweekly.com/2020/11/19/marin-students-again-targeted-with-antisemitic-social-media-posts/.

[120] *Marin Public Schools Fail to Beat Bullies*, 2015/2016 Marin County Civil Grand Jury (June 2, 2016), chrome-extension://efaidnbmnnnibpcajpcglclefindmkaj/https://assets.marincounty.gov/marincounty-prod/public/2025-09/06.09.16%20Marin%20Schools%20Fail%20to%20Beat%20Bullies.pdf.

[121] *See, e.g.*, Thom Jensen, *Viral 'Devious Lick' TikTok Challenge Leaves Bay Area Schools Vandalized*, NBC Bay Area (Sep. 17, 2021), https://www.nbcbayarea.com/news/local/east-bay/viral-devious-lick-tiktok-challenge-leaves-bay-area-schools-vandalized/2658865/.

[122] Gideon Rubin, *Tik Tok-Inspired 'Orbeez Challenge' Incidents Reported in Marin: cops*, Patch (Mar. 30, 2022), https://patch.com/california/sananselmofairfax/marin-orbeez-challenge-incidents-probed.

[123] *violence warning; Schools in Marin, across nation respond to threats on TikTok*, Marin Independent Journal (Dec. 18, 2021).

in Marin County after school officials learned of the graffiti and threats on social media posts.[124] In September 2024, a threat to Mount Tamalpais High School District in Marin County on social media led to the canceling of classes and the arrest of the perpetrator.[125]

83. Defendants' social media platforms have facilitated sex crimes against Marin County youth. In 2025, a 13-year-old Novato resident reported being sextorted on social media. A suspect obtained the child's private photos from the victim's social media. In exchange for not distributing the images, the suspect then demanded sex acts from the 13-year-old. The suspect was booked into Marin County Juvenile Hall for possession of child pornography, among other crimes.[126] In 2024, a child in Novato reported a sexual assault against a man who had posed as a 15-year-old on social media. The man was booked into Marin County Jail on charges of rape of a drugged victim and unlawful sexual intercourse with a minor.[127] In response to such crimes, the Marin County District Attorney's Office, along with the County Sheriff's Office and other local law enforcement have dedicated resources to conduct online sting operations against such predators.

84. Marin County students have also organized body positivity trainings and awareness events to combat what they see as harmful beauty standards perpetuated on social media that can lead to poor body image and eating disorders.[128]

---

[124] Vince Cestone, *VIDEO: Graffiti found in Marin County high school bathroom stall warns of school shooting Friday*, KRON4 (Sep. 29, 2017), https://www.kron4.com/news/video-graffiti-found-in-marin-county-high-school-bathroom-stall-warns-of-school-shooting-friday/.

[125] Tim Fang, *Teen arrested after Tamalpais High School District cancels classes over threats*, CBS News, (Sep. 13, 2024), https://www.cbsnews.com/sanfrancisco/news/tamalpais-union-high-school-district-closed-sep13-reported-threats/.

[126] Aidin Vaziri, *Novato teen arrested in sextortion case involving 13-year-old*, *supra* n. 4.

[127] Ryan Mense, Fremont man arrested for rape of child in North Bay, KRON4 (Dec. 30, 2024), https://www.kron4.com/news/bay-area/fremont-man-arrested-for-rape-of-child-in-north-bay/.

[128] Valentino Cabello and Bricieda Diaz, *Marin Voice: 'Love Your Body Week' about self-compassion, connection*, Marin Independent Journal (Feb. 22, 2026), https://www.marinij.com/2026/02/22/marin-voice-love-your-body-week-about-self-compassion-connection/.

85. Marin County has witnessed the mental and behavioral health needs of its youth skyrocket in relation to use of Defendants' platforms. In one survey of almost 200 students in a Marin County high school, 90% of students indicated a moderate to high need for mental health support.[129]

86. Marin County officials have documented the negative impacts of social media addiction among their constituency. Indeed, the Marin County Board of Supervisors has made it a legislative priority to support state and federal efforts for healthy, age-appropriate social media usage. The priority includes funding for law enforcement and schools to promote safe and responsible usage of online platforms. As part of that effort, the Marin County Board of Supervisors wrote a letter to Senator Brian Schatz in support of the 2025 Senate Bill 178 to prohibit users under the age of 13 from accessing social media platforms, stop the use of personalized algorithms designed to keep users under 17 on platforms for longer, and limit social media use in school.[130]

87. Police departments, hospitals, and public and nonprofit service providers have seen an uptick in local teens and adolescents needing mental and behavioral health services, a reality that has strained resources of some response programs. As a result, Marin County has been forced to divert resources and expend additional resources in an attempt to address the decline in youth mental, emotional, and social health within its schools.

**E. Social Media Has Had a Harmful Effect on Marin County**

88. Marin County is uniquely harmed by the current youth mental health crisis. In response, Marin County has been forced to fund extensive mental health services for youth. Marin County Behavioral Health and Recovery Services provide a continuum of care to meet the needs

---

[129] Christina Tejada and Jessica Mendieta, *Marin Voice; State-funded Novato High program helps ID students' mental health support needs*, Marin Independent Journal (May 13, 2022). https://www.marinij.com/2022/05/13/marin-voice-state-funded-novato-high-program-helps-id-mental-health-support-needs/.

[130] Letter from Mary Sackett to Senator Brian Schatz, Re: Support for S.278, Kids Off Social Media Act (Mar. 5, 2025), https://www.marincounty.gov/departments/executive/budget-and-priority-setting/legislative-support-and-advocacy/legislative-letters/mar-5-support-s278-kids-social-media-act.

of its youth residents, beginning with prevention and early intervention, all the way to providing residential care for children in need of the highest level of care.

89. Marin County prevention and early intervention programs include school based wellness services, mentoring, parent groups offered in multiple languages, and drop-in hours at a youth community center. Between 2021 and 2026, the County implemented a peer mentee program called the Student Wellness Ambassador Program on school campuses. The program trained peer mentees, along with on-site adult coordinators, to provide mental health support and connect the wider student body to available resources.[131] Additional school-based behavioral health services include training teachers and staff, social-emotional learning, substance use awareness campaigns, body-positive trainings, and supports for underserved students.[132]

90. Marin County provides comprehensive outpatient services through its Youth and Family Services division, including home and school based services. This also includes outpatient eating disorder treatment, peer counselors and support specialists, a child/youth medication clinic, outpatient substance use services, and early childhood mental health services for children. A new pilot provides school-based substance use disorder treatment.

91. For youth with greater needs, Marin County provides intensive outpatient and residential services. Marin County's Youth Empowerment Services program provides mental health services to high-risk youth in their homes, schools, and in the community, including intensive case management, psychiatric care, medication support, as well as collaboration with partner agencies.[133] Programs also include an intensive outpatient and partial-hospitalization eating disorder program, an early psychosis program for ages 15-30, wraparound services,

---

[131] *Mental Health Services Act (MHSA) FY 2025/2026 Annual Update & Amendment to the FY 2024/2025 Annual Update*, County of Marin Health & Human Services, at 251-62 (June 10, 2025), https://www.marinhhs.org/sites/default/files/libraries/2026_01/marin_au_2526.pdf.

[132] *School-Based Behavioral Health programs*, Marin Health & Human Services, https://hhs.marincounty.gov/services/school-based-behavioral-health-programs.

[133] *Youth and family behavioral health services*, Marin Health & Human Services, https://hhs.marincounty.gov/services/get-mental-health-or-substance-use-services/youth-and-family-behavioral-health-services.

therapeutic behavioral services, and intensive home-based services. Marin County provides short-term residential therapeutic program for foster and probation youth, along with residential substance abuse services and eating disorder treatments.

92. Marin's services include crisis intervention and stabilization, including a Mobile Crisis Team, a County-operated Crisis Stabilization Unit with two dedicated beds for children and youth, and a Crisis Aftercare Team. Crisis management services includes hospital diversion support for youth under 18 and family urgent response services for foster youth. Marin County's Suicide Prevention Collaborative partners with other youth-based groups to support awareness campaigns and promote the crisis text line in schools.[134] Forty percent of the county's suicide prevention budget is attributed to youth.[135] Marin County also funds a family partnership program to provide emotional support, psycho-education, and guidance to families navigating different support systems on behalf of their children.

93. In response to the growing concern over online exploitation of children, the Marin County Sheriff's Department has collaborated with the Marin County District Attorney's Office and other Marin County agencies to conduct operations targeting online sexual predators looking to meet minors on social media. A one-day operation in 2025 resulted in four arrests of adults seeking to meet minors online; another one-day operation this year resulted in two additional arrests.[136]

94. Marin County has invested in resources to address youth mental health issues due to the youth mental crisis. Despite all of the programs and services it offers and funds, Marin

---

[134] The Youth Action Team and Marin 9 to 25, Marin Behavioral Health & Recovery Services, Marin Outreach & Prevention Team, https://prevention.marinbhrs.org/youth-action-team-and-marin-9-25.

[135] County of Marin Health & Human Services, *Mental Health Services Act (MHSA) FY 2025/2026 Annual Update*, *supra* n.132 at 233.

[136] *Summer Internet Safety Reminder for Families*, County of Marin News Release (June 17, 2026), https://www.marincounty.gov/news-releases/summer-internet-safety-reminder-families; *Four Men Charged in Child Exploitation Operation*, County of Marin News Release (Feb. 21, 2025), *https://www.marincounty.gov/news-releases/four-men-charged-child-exploitation-operation*.

County is struggling to provide enough mental health services because of the increase in youth seeking these services. Marin County requires significantly greater and long-term funding to address the epidemic Defendants have created. It is time, as President Biden declared, to get "all Americans the mental health services they need."[137]

95. Marin County has borne increased costs and expenses in response to the youth mental health crisis. These costs include allocating funding for, among other expenses:

(a) developing additional mental health resources including mental health programs for Marin County youth;

(b) hiring additional mental health personnel to focus on youth mental health;

(c) training social workers and other personnel to help youth with their mental health, including assessment and diagnosis tools, suicide prevention approaches, trauma-informed care strategies, and peer support programs for youth;

(d) producing and distributing educational materials on social, emotional, and mental health for youth, including suicide prevention materials;

(e) coordinating and delivering mental health care services within Marin County, including offering assessments, case management, therapy, youth substance-use prevention and treatment and services, and suicide prevention efforts;

(f) increasing intervention services;

(g) repairing property damaged as a result of Defendants' harmful platform design features;

(h) funding law enforcement efforts related to sex crimes against minors, including sexual abuse and sextortion; and

(i) increasing resources to law enforcement and other diversionary services to address increase in anti-social and criminal behavior by youth.

---

[137] President Biden's State of the Union Address (Mar. 1, 2022), https://www.bidenwhitehouse.archives.gov/state-of-the-union-2022/.

## II. ADDITIONAL CAUSES OF ACTION

### COUNT III

### Fraudulent Misrepresentation and Concealment
### (Against All Defendants)

96. At all times relevant to this litigation, each Defendant concealed and intentionally failed to disclose material facts known to them regarding the dangers of their social media platforms for youth. Defendants sought to further the public perception about the safety of their social media platforms for youth by disseminating false statements to Congress and to the public. Any risk disclosures were substantially understated.

97. Each Defendant intended the omission of the concealed facts to deceive Plaintiff, and intended Plaintiff to rely upon the omission.

98. Plaintiff was unaware of the concealed facts. Plaintiff, its agents, and the public justifiably relied on the false information Defendants provided to them, both directly and indirectly, as Defendants intended.

99. As a result, Plaintiff proceeded under the misapprehension that the youth mental health crisis was a result of conduct by persons other than Defendants, and was prevented from taking more effective and earlier steps to respond to the youth mental health crisis.

100. Had Plaintiff known the truth about the concealed facts, Plaintiff would have taken other steps to correct the false information and address earlier the youth mental health crisis it faced.

101. Each Defendant's failure to disclose information about the true level of danger presented by Defendants' social media platforms to Plaintiff's residents deceived Plaintiff, and was a substantial factor in causing harm to Plaintiff.

102. Plaintiff was damaged due to its justified reliance on each of the Defendants' fraudulent misrepresentations and concealments, which were made with oppression, fraud, or malice.

**COUNT IV**

**Gross Negligence**
**(Against All Defendants)**

103. Negligence is established where the defendant owes the plaintiff a duty of care, breaches that duty, and the plaintiff sustains harm proximately caused by the defendant's breach. A presumption of negligence (negligence *per se*) is established where a defendant's negligence involves the violation of a statute or regulation, where the plaintiff is within the class of persons that the statute or regulation was designed to protect, and the violation is a substantial factor in the plaintiff's harm.

104. Gross negligence is the lack of any care or an extreme departure from what a reasonably careful person would do in the same situation to prevent harm to oneself or to others, or where a defendant breaches a duty of care in a way that is unreasonably dangerous to consumers.

105. Defendants owed the public legal duties, including a preexisting duty not to expose Plaintiff to an unreasonable risk of harm and a duty to exercise reasonable and ordinary care and skill in accordance with the applicable standards of conduct in designing, creating, operating, and marketing a product to youth.

106. At all relevant times to this litigation, each of the Defendants owed Plaintiff duties under statutory and common law, including the duty to exercise reasonable care in the designing, marketing, promoting, and operating of their platforms and the duty to take all reasonable steps necessary to design, market, promote, and operate their platforms in a way that was not unreasonably dangerous to youth.

107. +At all times relevant to this litigation, Defendants knew or should have known of the dangers of Defendants' platforms and, specifically, that their prioritization and creation of harmful content and facilitation of widespread, excessive, and habitual use of their platforms by youth resulted in, and continues to result in, significant harm to Plaintiff. As such, Defendants have breached their duty of care owed to Plaintiff.

108. Defendants also owed Plaintiff the duty to comply with COPPA's prohibition on collecting personal information from users under 13 years old. Defendants breached their duty

under COPPA by creating a platform targeted at users under 13, allowing users to self-report their age, and collecting such data without any verifiable consent from the parents of its under-13 users.

109. Defendants have breached and continue to breach their duty of care owed to Plaintiff through their actions, business decisions, and policies in the development, setup, management, maintenance, operation, marketing, advertising, promotion, supervision, and control of their respective platforms.

110. Defendants' gross negligence includes:

(a) designing its social media platforms to be addictive;

(b) targeting and aggressively marketing to youth to grow their platforms and maximize ad revenue;

(c) failing to implement effective parental controls;

(d) failing to provide adequate options to parents and youth users to self-restrict time spent on the platforms;

(e) promoting cosmetic surgery filters to youth and failing to label filtered content;

(f) failing to implement robust age verification;

(g) failing to implement reporting protocols to allow parents and youth users to report CSAM, adult predators, and other harmful content on the platform;

(h) failure to warn of known risks of harm to youth; and

(i) otherwise designing and marketing their social media platforms in ways that cause significant harm to the mental health of Marin County's youth.

111. Defendants knew and/or should have known it was foreseeable that Plaintiff would suffer injuries as a result of Defendants' failure to exercise ordinary care in the designing, marketing, promoting, and/or operating of their platforms, particularly when Defendants targeted youth in Marin County.

112. Defendants' gross negligence was an extreme departure from the ordinary standard of conduct. Defendants' conduct was so reckless, wanton, and lacking in care that it constitutes a conscious disregard or indifference to the life, safety, or rights of persons exposed to such conduct,

including youth in Marin County, in that Defendants acted with reckless indifference to the results, or to the rights or safety of others, because Defendants knew, or a reasonable person or company in Defendants' position should have known, that Defendants' conduct created an unreasonable risk of harm, and the risk was so great that it was highly probable harm would result.

113. As a direct and proximate cause of Defendants' unreasonable and negligent conduct, Plaintiff has suffered, and will continue to suffer harm.

114. Plaintiff is within the protected class of persons that COPPA was designed to protect and Defendants' violation of COPPA is a substantial factor in Plaintiff's harm.

**COUNT V**

**Violation of the Racketeer Influenced and Corrupt Organizations Act, 18 U.S.C. §1961, *et seq.* (Against All Defendants)**

115. This claim is brought by Plaintiff against all Defendants for actual damages, treble damages, and equitable relief under 18 U.S.C. §1964 for violations of Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. §1961, *et seq*.

116. RICO makes it "unlawful for any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity." 18 U.S.C. §1962(c).

117. At all relevant times, each Defendant is and has been a "person" within the meaning of 18 U.S.C. §1961(3) because each is capable of holding, and does hold, "a legal or beneficial interest in property."

118. Each Defendant conducted the affairs of an enterprise through a pattern of racketeering activity, in violation of 18 U.S.C. §1962(c), as described herein.

119. Plaintiff is a "person" within the meaning of 18 U.S.C. §1961(3) and has standing to sue under 18 U.S.C. §1964(c) because it was and is injured in its business and/or property "by reason of" the RICO violations described herein.

120. Defendants – through the use of Industry Groups that appeared to be independent of Defendants and through the dissemination of publications that supported Defendants' Scheme – conducted an association-in-fact enterprise, and/or participated in the conduct of an enterprise through a pattern of illegal activities (the predicate racketeering acts of fraud by way of corruption of an official proceeding, and mail and wire fraud), to carry out the common purpose of the Enterprise, *i.e.*, to promote false and misleading statements to Congress, parents, school districts, and the American public about the safety of their platforms for youth users while simultaneously flooding youth with addictive and otherwise harmful experiences, thereby maximizing profits and revenues. Through the racketeering activities of the Enterprise, Defendants sought to further the public perception about the safety of their social media platforms for youth and thereby grow their youth users and youth engagement on social media by disseminating false statements about the safety of social media for youth. In so doing, each of the Defendants knowingly conducted and participated in the conduct of the Enterprise by obstructing justice by providing false and misleading testimony to Congress regarding social media platforms in violation of 18 U.S.C. §1512(c) and by engaging in mail and wire fraud in violation of 18 U.S.C. §1962(c)-(d).

121. Plaintiff demands all applicable relief.

122. **The Enterprise**. Section 1961(4) of the U.S. Code defines an enterprise as "any individual, partnership, corporation, association, or other legal entity, and any union or group of individuals associated in fact although not a legal entity." 18 U.S.C. §1961(4).

123. The Enterprise alleged above is an association-in-fact enterprise that consists of Defendants and their Industry Groups.

124. Defendants formed an association-in-fact for the common and continuing purpose described herein and constitute an enterprise within the meaning of 18 U.S.C. §1961(4) engaged in the conduct of their affairs through a continuing pattern of racketeering activity. The members of the Enterprise functioned as a continuing unit with an ascertainable structure separate and distinct from that of the conduct of the pattern of racketeering activity to conduct their Scheme. There may also be other members of the Enterprise unknown to Plaintiff at this time.

125. Each of the Defendants exerted control over the Enterprise and participated in the conduct of the Enterprise by playing a distinct role in furthering the Enterprise's common purpose of growing youth users and youth user engagement on social media thereby increasing profits through the knowing and intentional dissemination of false and misleading information about the safety of Defendants' social media platforms for youth.

126. Specifically, Defendants each worked together to coordinate the Enterprise's goals of carrying out the youth safety scheme and conceal their roles, and the Enterprise's existence, from the public by, among other things: (a) preserving and enhancing the market for their social media platforms and Defendants' own profits, regardless of the truth, the law, or the health consequences to America's youth, including Plaintiff's students; (b) deceiving youth, their parents, schools and the public at large by falsely maintaining that their platforms are safe for youth; deceiving youth, their parents, schools, and the public at large by falsely maintaining that their platforms are safe for youth and not responsible for the apparent mental or emotional health consequences to youth, despite that Defendants knew otherwise; (c) deceiving youth, their parents, schools, and the public at large by falsely maintaining that Defendants could mitigate the mental or emotional health consequences to youth, despite Defendants knowing these negative consequences were inherent to their platforms' features and technology as designed; (d) deceiving youth, their parents, schools, and the public at large into becoming or staying addicted to their platforms by downplaying the risks to youth of the platforms, maintaining that their platforms were not addictive or prone to excessive use by youth or that any such consequences could be effectively mitigated, despite the fact that Defendants knew their platforms were inherently addictive or prone to excessive use by design and did not have adequate features to protect youth; (e) deceiving youth, their parents, schools, and the public at large by claiming they did not market to children, adolescents, and teenagers, while engaging in marketing and manipulation of their platform features to maximize youth engagement regardless of the health or safety concerns; and (f) deceiving youth, their parents, schools, and the public at large about the mental and emotional health risks to youth users of Defendants' platforms, including that their platforms were

intentionally and deliberately designed to target youth and maximize their engagement despite knowledge of resultant harm to youth users.

127. Each of the Industry Groups helped disguise the role of Defendants by purporting to be unbiased, independent professional organizations in order to disseminate a body of messaging that promoted Defendants' Scheme.

128. The Enterprise has pursued a course of conduct of deceit, misrepresentation, and conspiracy to make misrepresentations to the public; to withhold from the public facts material to the decision to use or permit children, adolescents, and teenagers to use Defendants' platforms; and to promote and maintain youth engagement on Defendants' platforms, and the profits derived therefrom, as well as to shield themselves from public, judicial, and governmental scrutiny.

129. At all relevant times, the Enterprise: (a) had an existence separate and distinct from each Defendant and its members; (b) was separate and distinct from the pattern of racketeering in which Defendants engaged; (c) was an ongoing and continuing organization consisting of individuals, persons, and legal entities, including each of the Defendants; (d) was characterized by regular communication and interpersonal relationships between and among each member of the Enterprise, including between Defendants and each of the Industry Groups; and (e) had sufficient longevity for the Enterprise to pursue its purpose and functioned as a continuing unit.

130. The persons and entities engaged in the Enterprise are systematically linked through contractual relationships, financial ties, personal relationships, and continuing coordination of activities, as spearheaded by Defendants.

131. Defendants alone could not have accomplished the purpose of the Enterprise without the assistance of the Industry Groups, which were perceived as "neutral" as compared to Defendants themselves. Without the work of the Industry Groups in spreading misrepresentations about the safety of youth social media use, the Enterprise could not have achieved its common purpose. As a result, it is clear that Defendants and the Industry Groups were each a willing participant in the Enterprise, had a common purpose and interest in the object of the Scheme, and functioned within a structure designed to effectuate the Enterprise's purpose.

132. **Pattern of Racketeering Activity**. Defendants, each of whom is a person associated with, or employed by, the Enterprise, did knowingly, willfully, and unlawfully conduct or participate, directly or indirectly, in the affairs of the Enterprise through a pattern of racketeering activity within the meaning of 18 U.S.C. §§1961(1), 1961(5), and 1962(c). The racketeering activity was made possible by each Defendant's regular and repeated use of the facilities and services of the Enterprise. Each Defendant had the specific intent to engage in the substantive RICO violations alleged herein.

133. Further, each of the Defendants and Industry Groups that made up the Enterprise had systematic links to and personal relationships with one another through joint participation in lobbying groups, trade industry organizations, contractual relationships, and continuing coordination of activities. The systematic links and personal relationships that were formed and developed allowed members of the Enterprise the opportunity to form the common purpose and agree to conduct and participate in the conduct of the Enterprise. Specifically, each of the Defendants coordinated its efforts through the same Industry Groups, based on their agreement and understanding that the Industry Groups were industry friendly and would work together with Defendants to advance the common purpose of the Enterprise; each of the individuals and entities that formed the Enterprise acted to enable the common purpose and fraudulent Scheme of the Enterprise.

134. Defendants controlled the resources and instrumentalities of the Enterprise and used that control to perpetrate their Schemes, including committing fraud through corruption of an official proceeding by falsely testifying before Congress and through the use of mail and wires. Foremost, separate and apart from their regular business dealings, Defendants misled and continue to mislead the public on the mental health dangers for youth on their platforms.

135. Defendants had the common purpose of preserving and enhancing the market for their platforms and for youth users for Defendants' own profits, regardless of the truth, the law, or the health consequences to the American people, including Plaintiff's students and the communities Plaintiff serves.

136. Defendants concealed and/or suppressed the relevant findings and research on social media harms to youth.

137. Through the Enterprise, Defendants engaged in a pattern of racketeering activity consisting of numerous acts of racketeering in the Northern District of California and elsewhere, including corruption of an official proceeding, mail fraud, and wire fraud, indictable offenses under 18 U.S.C. §§1512(c), 1341, and 1343.

138. **Predicate Acts**. Defendants each committed, conspired to commit, and/or aided and abetted in the commission of at least two predicate acts of racketeering activity (*i.e.*, violations of 18 U.S.C. §§1512(c), 1341, and 1343) within the past ten years. The multiple acts of racketeering activity that Defendants committed, or aided and abetted in the commission of, were related to each other, posed a threat of continued racketeering activity, and therefore constitute a "pattern of racketeering activity." The racketeering activity was made possible by Defendants' regular use of the facilities, services, distribution channels, and employees of the Enterprise, testimony before Congress, and the U.S. mail and interstate wire facilities. Defendants participated in the Scheme to defraud by obstructing justice and by using mail, telephones, television, and the Internet to transmit false and misleading messaging in interstate or foreign commerce.

139. Defendants' predicate acts of racketeering (18 U.S.C. §1961(1)) include, but are not limited to:

(a) **Corruption of an Official Proceeding**: Defendants violated 18 U.S.C. §1512(c) by providing false and misleading testimony to Congress and concealing and/or obstructing, influencing, and/or impeding official proceedings related to the benefits and safety of youth social media use;

(b) **Mail Fraud**: Defendants violated 18 U.S.C. §1341 by sending or receiving, or by causing to be sent and/or received, messages via the U.S. mail or commercial interstate carriers for the purpose of executing the unlawful Scheme to target and addict youth to social media by means of false pretenses, misrepresentations, promises, and omissions in order to increase profits; and

(c) **Wire Fraud**: Defendants violated 18 U.S.C. §1343 by transmitting and/or receiving, or by causing to be transmitted and/or received, messages by wire (including the internet) for the purpose of executing the unlawful Scheme to target and addict youth to social media by means of false pretenses, misrepresentations, promises, and omissions in order to increase profits.

140. As part of said Scheme and artifice, Defendants and their co-conspirators made misrepresentations and omissions about the risk of harm presented by youth use of social media. They also concealed acts done in furtherance of the Scheme.

141. Defendants and their co-conspirators communicated with each other directly and through their Front Groups in person, by mail, and by telephone and other interstate and foreign wire facilities, regarding the true nature of their platforms, the integrations of their platforms to maximize youth users despite the known harms to youth users while failing to adequately warn of such harms.

142. Defendants and their co-conspirators made misrepresentations directed toward government officials and to the public in furtherance of their conspiracy to deceive the public by means of telephone, mail, internet, television, wire transmissions, and other forms of interstate commerce and communications, in violation of 18 U.S.C. §1512(c).

143. Defendants and their co-conspirators knowingly transmitted and caused to be transmitted in interstate and foreign commerce by means of wire, radio, and television communication writings, signs, signals, pictures, and sounds (collectively "transmissions") in violation of 18 U.S.C. §§1341 and 1343.

144. **Conspiracy Allegations.** Defendants have not undertaken the practices described herein in isolation, but as part of a common scheme and conspiracy. In violation of 18 U.S.C. §1962(d) defendants conspired to violate 18 U.S.C. §1962(c), as described in this complaint. Defendants agreed and conspired with each other to drive youth users and engagement on their platforms, while failing to adequately warn of harm to youth and implement effective safety measures. *See supra* §II.H. Defendants have additionally agreed and conspired with each other and through Industry Groups to commission, edit, and arrange for favorable messaging with

misrepresentations about the benefits of their platforms for youth. *See supra* §II.H. The foregoing illustrates defendants' liability under 18 U.S.C. §1962(d), for conspiring to achieve their common goal of driving youth users and engagement.

145. Because Defendants disguised their participation in the Enterprise and worked to keep even the Enterprise's existence secret so as to give the false appearance that their false messages reflected the views of independent third parties, many of the precise dates of the Enterprise's uses of the U.S. mail and interstate wire facilities (and corresponding predicate acts of mail and wire fraud) have been hidden and cannot be alleged without access to the books and records maintained by Defendants and Industry Groups. Indeed, an essential part of the successful operation of the Enterprise alleged herein depended upon secrecy. However, Defendants and Industry Groups disseminated misrepresentations and false statements to youth, parents, schools, and regulators in Marin County.

146. Defendants and their coconspirators, through the Enterprise, would and did: (a) knowingly provide misleading and false testimony before Congress regarding the safety and targeting of social media platforms to youth, in violation of 18 U.S.C. §1512(c); (b) knowingly transmit those messages by wire, radio, or television; (c) knowingly place and cause to be placed in any post office or authorized depository for mail matter, matters and things to be sent and delivered by the U.S. Postal Service (and its predecessor, the United States Post Office Department) such false and/or misleading messages; (d) knowingly take and receive therefrom such matters and things; and knowingly cause to be delivered by mail according to the direction thereon, and at the place at which it is directed to be delivered by the person to whom it is addressed, any such messages, in violation of 18 U.S.C. §§1341 and 1343.

147. The pattern of racketeering activity alleged herein is continuing as of the date of this Complaint and, upon information and belief, will continue into the future unless enjoined by this Court.

148. The racketeering activities conducted by Defendants and Industry Groups amounted to a common course of conduct, with a similar pattern and purpose, intended to deceive Marin County youth, parents, and the public at large. Each separate instance of corruption of an

official proceeding, and use of the U.S. mail and/or interstate wire facilities employed by Defendants, was related, had similar intended purposes, involved similar participants and methods of execution, and had the same results affecting the same victims, including Plaintiff. Defendants have engaged in the pattern of racketeering activity for the purpose of conducting the ongoing business affairs of the Enterprise.

149. Each of the Defendants aided and abetted others in the violations of the above laws, thereby rendering them indictable as principals in the 18 U.S.C. §§1512(c), 1341, and 1343 offenses.

150. Defendants' violations of law and their pattern of racketeering activity directly and proximately caused Plaintiff injury in its business and property. Defendants' pattern of racketeering activity logically, substantially, and foreseeably caused a youth social media addiction/excessive use epidemic. But for the youth social media addiction/excessive use epidemic Defendants created through their Enterprise, Plaintiff would not have lost money or property. Plaintiff's injuries, as described below, were not unexpected, unforeseen, or independent. Such costs were either completely new or greatly in excess of the norm of what Plaintiff would ordinarily pay or be expected to pay to provide services to its students and communities and to maintain real and personal property and business interests.

151. It was foreseeable and expected that Defendants' creation and participation in the Enterprise through a pattern of racketeering activities to carry out their fraudulent Scheme would lead to a youth social media addiction epidemic, including in Marin County.

152. As a direct and proximate result of Defendants' longstanding Scheme to maximize youth users and their engagement on social media platforms known by Defendants to be dangerous for youth, while misrepresenting the safety and downplaying the risks for youth to parents, schools, and the American public, Plaintiff has suffered harm in the form of costs and expenditures associated with damage to its property and businesses directly and proximately caused by the alleged misconduct.

153. As a direct and proximate result of Defendants' longstanding Scheme, Plaintiff has sustained losses as a consumer or other type of market participant including, for example, its

purchases of products and services required to address the harms directly and proximately caused by the alleged misconduct.

154. Plaintiff has suffered injury in fact and has lost money or property as a direct and proximate result of Defendants' violations of RICO, including but not limited to:

(a) developing additional mental health resources including mental health programs for Marin County youth;

(b) hiring additional mental health personnel to focus on youth mental health;

(c) training social workers and other personnel to help youth with their mental health, including assessment and diagnosis tools, suicide prevention approaches, trauma-informed care strategies, and certified peer support programs for young adults;

(d) producing and distributing educational materials on social, emotional, and mental health for youth, including suicide prevention materials;

(e) coordinating and delivering mental health care services within Marin County, including offering assessments, case management, therapy, youth substance-use prevention and treatment and services, and suicide prevention efforts;

(f) increasing intervention services;

(g) repairing property damaged as a result of defendants' harmful platform design features;

(h) funding law enforcement efforts related to sex crimes against minors, including sexual abuse and sextortion; and

(i) increasing resources to law enforcement and other diversionary services to address increase in anti-social and criminal behavior by youth.

155. Plaintiff seeks all legal and equitable relief as allowed by law, including, *inter alia*, actual damages; treble damages; equitable and/or injunctive relief in the form of Court-supervised corrective communications, actions, and programs; forfeiture as deemed proper by the Court; attorneys' fees; all costs and expenses of suit; and pre- and post-judgment interest.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiff prays for judgment as follows:

1. Entering an order that the conduct alleged herein constitutes negligence, gross negligence, and a public nuisance under California law and violates the Federal RICO Act;

2. Entering an order that Defendants are jointly and severally liable;

3. Entering an order requiring Defendants to abate the public nuisance described herein and to deter and/or prevent the resumption of such nuisance;

4. Enjoining Defendants and any agents, successors, assigns, and employees acting directly or through any corporate or business device from engaging in further actions causing or contributing to the public nuisance as described herein and requiring Defendants to take affirmative steps to ensure their platforms are safe for youth users;

5. Enjoining Defendants from further violations of COPPA and directing that Defendants take affirmative steps to obtain "verifiable parental consent" prior to collecting and using information about them;

6. Directing Defendants to disgorge and forfeit all profits they have derived as a result of their fraudulent and deceptive acts and practices as set forth in this Complaint;

7. Awarding equitable relief to fund prevention education and treatment for excessive and problematic use of social media;

8. Awarding actual and compensatory damages;

9. Awarding statutory damages in the maximum amount permitted by law;

10. Awarding reasonable attorneys' fees and costs of suit;

11. Awarding pre-judgment and post-judgment interest; and

12. Such other and further relief as the Court deems just and proper under the circumstances.

DATED: August 25, 2026

ROBBINS GELLER RUDMAN
& DOWD LLP
AELISH M. BAIG
TAEVA C. SHEFLER

s/ Aelish M. Baig
AELISH M. BAIG

One Montgomery Street, Suite 1800
San Francisco, CA 94104
Telephone: 415/288-4545
415/288-4534 (fax)
aelishb@rgrdlaw.com
tshefler@rgrdlaw.com

OFFICE OF MARIN COUNTY COUNSEL
BRANDON W. HALTER (289687)
Marin County Counsel
KATE STANFORD (302825)
Deputy County Counsel
County of Marin
3501 Civic Center Drive, Suite 275
San Rafael, CA 94903
Telephone: 415/473-6117
brandon.halter@marincounty.gov
kate.stanford@marincounty.gov

ROBBINS GELLER RUDMAN
& DOWD LLP
THOMAS E. EGLER (189871)
655 West Broadway, Suite 1900
San Diego, CA 92101-8498
Telephone: 619/231-1058
619/231-7423 (fax)
tome@rgrdlaw.com

ROBBINS GELLER RUDMAN
& DOWD LLP
MARK J. DEARMAN
STUART A. DAVIDSON (admitted *pro hac vice*)
NICOLLE B. BRITO
225 NE Mizner Boulevard, Suite 720
Boca Raton, FL 33432
Telephone: 561/750-3000
561/750-3364 (fax)
mdearman@rgrdlaw.com
sdavidson@rgrdlaw.com
nbrito@rgrdlaw.com

ROBBINS GELLER RUDMAN
& DOWD LLP
ANA AVALOS CUELLAR
420 Lexington Avenue, Suite 1832
New York, NY 10170
Telephone: 212/432-5100
aavalos@rgrdlaw.com

Attorneys for Plaintiff